THOMAS J. SHEIBLEY v. WILLIAM N. HUSE.

FILED FEBRUARY 22, 1906. No. 13,896.

1. **Bill of Exceptions.** The certificate of the presiding judge attached to a bill of exceptions, to the effect that the bill contains all the evidence offered by either party on the trial of the cause, is a sufficient certification that the bill contains all the evidence received or offered.

2. **Libel.** A newspaper article, charging a person with originating and circulating false and malicious reports attacking the character of another, is libelous, and is actionable *per se.*

3. ———: COMPLAINT. Section 131 of the code has abrogated the common law rule requiring facts and circumstances to be stated in the complaint to connect the plaintiff with the defamatory publication. It is now sufficient to allege that the libelous matter was published of and concerning the plaintiff.

4. **Pleading:** AIDER BY ANSWER. A petition, defective in the matter of charging a publication of the alleged defamatory matter, is cured by an answer which admits such publication.

5. **Libel:** DEFENSE. That a libel was copied from another paper is not a defense to an action brought for its publication, but under proper circumstances such fact may be pleaded and shown in mitigation of damages.

6. ———: ———. The publisher of a newspaper may freely expose false and defamatory matter circulated concerning a candidate for a public office, but, in so doing, he may not libel another party, and can defend against such libel only by showing the truth of the publication.

ERROR to the district court for Madison county: JOHN F. BOYD, JUDGE. *Reversed.*

*George W. Argo* and *W. E. Gantt,* for plaintiff in error.

*W. M. Robertson, Mapes & Hazen, McCarthy & McCarthy, Allen & Reed, C. A. Irwin* and *John V. Pearson, contra.*

DUFFIE, C.

Thomas J. Sheibley, the plaintiff in error, filed his petition in the district court for Madison county asking to

recover from the defendant damages on account of an alleged libel published in the Norfolk News. His petition is in the following language: "The plaintiff above named complains of the defendant, and alleges: (1) That on the first day of November, 1902, the defendant, at Norfolk, Nebraska, falsely, wickedly and maliciously composed and published of and concerning the plaintiff in the said Norfolk News, the false and defamatory matter following, to wit: 'A slanderous falsehood. Fusion desperation prompts vilification. Will prove a boomerang. Affidavits to prove that the allegations are false in every particular in possession of committee. Will increase votes for McCarthy. The publishing of that malicious story from the Homer Echo by the Times-Tribune of this city concerning Hon. J. J. McCarthy has but one interpretation, it means desperation on the part of the fusion candidate and his supporters. They see defeat, sure and certain, staring them in the face, and in their effort to stem the tide they resort to the most despicable tactics known to politics— that of assaulting the good name and the honor of the opposition candidate. McCarthy is not only going to be elected, but he is going to receive the biggest majority from his home county that he has ever known during his previous campaigns, and the counties adjoining Dixon, where the facts are best known, are going to join in swelling that majority to a handsome figure. The returns will prove it, and the opposition knows it. This will prove the best refutation of the malicious slander possible, but at this distance from Mr. McCarthy's home it may be pardonable to explain the true animus of the story. It is one of those stories that are sprung on the eve of election, when it is hoped that there will be no opportunity to counteract the statement and assertions made. Those who circulate it rely on its immediate effect and hope to turn votes that could not be otherwise affected.' The Ponca Journal, published at Mr. McCarthy's home town, has this to say concerning the slander: "Ever since it was known that J. J. McCarthy of this city had aspirations to represent this district in congress,

both before the nomination convention and since the nomina-
tion was made, a systematic attempt has been carried on by
innuendoes, insinuations and direct accusations to blacken
his character and make him appear a criminal of the most
contemptible sort.    That this has been done by his enemies
for vindictive spite work is known to almost everybody in
this locality.    In other parts of the district it may not be
so well known.    The true facts, however, have spread al-
most as rapidly as the false statements, and already a
strong reaction has set in which cannot help but result
strongly to his advantage." The man who has directed
this campaign of slander (meaning the plaintiff in this
action) was compelled to cough up to Dixon county the
neat sum of $411.76 of misappropriated funds, and Justice
NORVAL of the supreme court, in giving his decision, dis-
missed the matter with the simple statement that judgment
might easily have been obtained for a much larger sum.
For the truth of this decision we refer to the 85th N. W.
Reporter, page 399.    Voters all over the country are be-
coming digusted with the vilifying campaign that has
been carried on.    The question naturally suggests itself,
if McCarthy has been guilty of a crime, why have not the
offended parties sought redress at law?    Even though we
have not had the absolute proofs of the falsity of the charges
made, would it not behoove the intelligent thinking public
to pause and consider the fact that J. J. McCarthy has lived
in Dixon county for the past twenty years, from the time
when a boy until he is now well along in years, that he
has raised a family, and lived right here in our midst, that
no one ever discovered that he was the immoral man that
a few of the opposition seek to make out that he is until
he aspires to a high and honorable office?    Voters, think
well of these things.    The Newcastle Times, published
closer to Mr. McCarthy's home than the Homer Echo, han-
dles the story in this fashion:    "The Homer Echo has not
only disgraced itself and shown its editor to be a mean,
contemptible vilifier and a liar, but it has, in its article of
last week upon McCarthy, cast a cloud upon the editorial

profession as well.  The Echo editor did what is seldom done by a true newspaper man, that is, at the close of a political campaign, a few days before election, go down into the slums of slander and produce filthy lies, which the editor himself knows to be false.  Here is the proof taken from the article: 'The editor of this paper has heard these statements for a number of months, and a few weeks ago went to the nominee's home town to ascertain if the statements were true, and we are informed by a number of reliable persons that there is no question about the facts, and that the same can be proved.'  How is that, dear reader, for proof; isn't that evidence for you?  Been informed by a number of persons that the statements can be proved. The Times editor has looked over the affidavits of the parties who have been dragged into the lying stories about McCarthy, and those affidavits, copies of which can be seen at the Times office, completely vindicate him.  This move on the part of the Echo must react for Mr. McCarthy, as no man is safe to run for office, if just before election he is to be maligned and slandered, and it is said that a lie will travel around the earth while truth is putting on its boots." The republican congressional committee has issued the following statement of the situation which bears the signature of Chairman F. D. Fales and Secretary Jack Koenigstein: "This republican congressional central committee has been informed that a base, slanderous attack is being made by our opponents on the character of Hon. J. J. McCarthy in these closing days of the campaign.  The committee have carefully investigated the statements being circulated, and know them to be false in every detail; that they have been prepared for their supposed political effect, and are being used as an attempt to estrange votes from the republican candidate, and to promote the interest of the fusion nominee.  This committee is in possession of counter-affidavits showing conclusively that all of the charges against our candidate are absolutely false.  J. J. McCarthy has led a clean and honorable life in this district for twenty years and no breath of suspicion as to his

morality was ever hinted at until his political enemies, in their desperation, knowing his strength with the people, conceived the idea of procuring perjured statements with the hopes of thereby injuring his candidacy.   Every fair-minded man will condemn this contemptible method of attack, and every lover of justice and fair play will register his protest against this outrage.   The animus of this attack originated in a case in which J. J. McCarthy was employed to assist the county in an action brought to recover fees belonging to Dixon county, which T. J. Sheibley (meaning the plaintiff) as county clerk had failed to account for.   This case is reported in Northwestern Reporter, Vol. 85, page 399, and since which time T. J. Sheibley (meaning the plaintiff) has been active in originating and circulating false and malicious reports attacking the character of the republican candidate for congress in this district.' "

"(2) That by means of said false and defamatory publication the plaintiff was injured in his reputation to his damage in the sum of $6,000.   Wherefore plaintiff asks judgment against said defendant for said amount of $6,000, and for costs of suit."

The defendant answered: "(1) Denying each and every allegation in said petition contained except as hereinafter specifically admitted or otherwise answered.   (2) Admits that he published the article substantially as set out and complained of in the plaintiff's petition, but denies that said article was published falsely, wickedly or maliciously; alleges that the said article as aforesaid published by the defendant and set forth and complained of in plaintiff's petition is true, and defendant believed the same to be true at the time of its publication, and published the same in good faith with good motives and for justifiable ends, to wit, for the purpose of advising his readers regarding the character of J. J. McCarthy, who was then a candidate for congress in the third district of this state, which included Madison county, in which said county and district Norfolk is located, and defendant was supporting said J.

J. McCarthy in the columns of the Norfolk News of which
he was then editor and publisher at Norfolk, Nebraska, and
that he published said article in response to attacks which
the plaintiff and others had made upon the character of
said J. J. McCarthy." A reply in the nature of a general
denial was filed to this answer.

Upon the trial the plaintiff called William N. Huse, the
defendant, as a witness, who testified that he lived at Nor-
folk, Nebraska; that he was publisher of a newspaper, the
Norfolk Daily News, and was such publisher on the 1st of
November, 1902, and prior to that time. He further tes-
tified that he published the article in question in his daily
paper which was of general circulation in this state; that
he had known Thomas J. Sheibley, the plaintiff, for about
25 years; that he was commonly known as "Tom Sheibley,"
and that he was at one time clerk of Dixon county. Upon
objections made by the defendant, the court refused to al-
low him to state whether the party referred to in the
article was Thomas J. Sheibley, the plaintiff in the action,
or whether he was the party referred to in the opinion in
the 85th Northwestern Reporter. Huse was the only wit-
ness sworn, and after his examination the plaintiff
rested.    Whereupon the defendant moved the court to
direct a verdict in his favor upon the following grounds:
"First, because there is not sufficient evidence to authorize
the plaintiff to recover; second, because the petition does
not state facts sufficient to constitute a cause of action;
third, because it is not alleged in the petition that the
article, which is a quoted article, was wilfully and mali-
ciously republished by the defendant with a knowledge of
its falseness, and with intent to injure and libel the plain-
tiff." This motion was sustained, and the jury directed ac-
cordingly. The plaintiff's motion for a new trial was over-
ruled, and he has brought the case to this court on error.

A motion made by the defendant to quash the bill of ex-
ceptions was submitted with the case.    The objection
urged against the bill is that the presiding judge does not
certify that it contains all the evidence offered and re-

ceived, or introduced by either party on the trial. The certificate is as follows: "The foregoing is all the evidence offered by either party on the trial of the above entitled cause, and, on application of the plaintiff, this bill of exceptions is allowed by me and ordered to be made a part of the record in this case." The particular objection urged on argument is that the certificate does not recite that the bill contains all of the evidence received upon the trial, or show that any evidence was received. It is clear that evidence, in order to be received, must be offered by one of the parties, and, when a trial judge certifies that all the evidence offered is contained in the bill to which his certificate is attached, we think it covers all evidence received, as well as that offered, and that it is sufficient.

It is urged with great earnestness, on the part of the defedant in error, that the plaintiff's petition is not sufficient, in that it contains no recital of facts showing that the alleged libelous article referred to the plaintiff, or that he was the party, or one of the parties, against whom the charges made in the article were directed. In the absence of a statute to the contrary, if the defamatory words are indefinite or ambiguous, and extrinsic facts and circumstances are necessary to show that the plaintiff was meant, the petition must set forth such extrinsic facts and circumstances in order to connect the plaintiff with the allaged defamatory matter. This is the common law rule. Section 131 of the code has abrogated that rule. It is as follows: "In an action for a libel or slander, it shall be sufficient to state, generally, that the defamatory matter was published or spoken of the plaintiff, and if the allegation be denied, the plaintiff must prove on the trial the facts, showing that the defamatory matter was published or spoken of him." In a late case before the supreme court of Kansas (*Eckert v. Van Pelt*, 69 Kan. 357, 66 L. R. A. 266), an identical statute was under consideration. The libelous article complained of in that action did not contain the name of the plaintiff, and a demurrer was interposed to the petition, which was overruled. In review-

ing the action of the trial court in this regard the supreme court used this language:

"It is argued that this ruling of the court was erroneous, for the reason that the newspaper article alleged to be libelous did not contain the name of plaintiff below, and because there was no allegation that the public understood the language used to refer to Van Pelt. The averments of the petition expressly charge that defendant published the words 'of and concerning him, the said plaintiff.' The omission of the name of a libeled person in a publication concerning him does not deprive the matter of its libelous character if it be alleged and shown to whom the words used were intended to apply. Whatever may have been the common law rule, it is not now necessary to allege, in order to state a cause of action, that the public understood the words printed to refer to the plaintiff. Section 4559, Gen. Stat. 1901, reads: 'In an action for libel or slander, it shall be sufficient to state, generally, that the defamatory matter was published or spoken of the plaintiff; and if the allegation be denied, the plaintiff must prove on the trial the facts showing that the defamatory matter was published or spoken of him.' Counsel for plaintiff in error cite the case of *DeWitt v. Wright*, 57 Cal. 576, which supports their claim for the necessity of an averment that the person or persons who read the article knew that the plaintiff was meant. This case, however, was expressly overruled in *Harris v. Zanone*, 93 Cal. 59, 28 Pac. 845, in which it was said that the rule of the former case is not supported by authority, or justified on principle."

As was said in *Kinyon v. Palmer*, 18 Ia. 377: "The statute dispenses with the averment of extrinsic facts (and hence with much of the useless verbiage of a common law declaration in slander or libel), showing that plaintiff was meant by the defamatory matter, it being sufficient to aver, in general terms, that it was published of and concerning him."

We think that under the decisions in all states having a

statute like our own the petition in this respect is sufficient.

It is further argued in support of the action of the trial court that the petition does not fairly charge a publication by the defendant. In his brief it is said: "It is not alleged that the Norfolk News is a newspaper, magazine or other publication having a circulation, or, in other words, that there was a publication of the libel. To simply compose or write an article, however libelous it may be, is not sufficient to constitute a cause of action against the author or to make it actionable. It must be published, that is, it must have been given out or circulated in some way. There is no allegation of a publication or of a circulation of the article, and we are certainly within the safe rule of pleading when we say that this is strictly essential to a recovery, and that the court cannot presume that the Norfolk News is a newspaper, magazine or other publication having a circulation."

In *Hemphill v. Holley,* 4 Minn. 233 (Gil. 166), it is held that, where the defendant, in an action for libel, admits the publication and attempts to justify in his answer, he is estopped from objecting to the complaint on the ground that the publication is not sufficiently alleged. And, while the question is not before us and we do not announce it as a rule to be followed, the authorities are numerous to the effect that, where the defamatory matter is in writing, no direct averment that it has been communicated to a third person is necessary.

It is further urged that the article is not libelous *per se,* and that, as no proof of malice in publishing the same was offered, the court properly directed a verdict for the defendant. It can hardly be claimed that procuring a libel to be published against another is not a criminal offense, and, when the article in direct terms charges the party or parties referred to in the article with procuring perjured statements against the character of J. J. McCarthy, it cannot certainly otherwise appear to the reader than that these parties were guilty of procuring the publication of a libel. Again, in Townshend, Slander and Libel, sec. 176, it is said:

"That language in writing is actionable *per se* which denies 'to a man the possession of some such worthy quality as every man is *a priori* to be taken to possess,' or, which 'tends to bring a party into public hatred or disgrace,' or 'to degrade him in society,' or expose him to 'hatred, contempt, or ridicule or obloquy,' or 'which reflects upon his character,' or 'imputes something disgraceful to him,' or 'throws contumely' on him, or 'contumely and odium,' or 'tends to vilify him,' or 'injure his character, or diminish his reputation,' or which is 'injurious to his character,' or to his 'social character,' or shows him to be 'immoral or ridiculous,' or 'induces an ill opinion of him,' or 'detracts from his character as a man of good morals,' or 'alters his situation in society for the worse,' or 'imputes to him a bad reputation,' or 'degradation of character' or 'ingratitude.' " If the charges made in this publication are true, then the parties referred to, who sought to vilify, to degrade, and to have it understood that Mr. McCarthy's moral character was bad, that they went to the extent of procuring perjured statements in the form of affidavits to support their charges, that they were circulating libelous statements affecting the character of Mr. McCarthy, by such action, would certainly tend to degrade their character in any decent community, aside from the criminal liability which attached to such a course. There can be no doubt that the publication was libelous *per se,* both at common law and under our statute defining libel.

Counsel further insist that the original matter contained in the article is not libelous, and, as to the quoted matter, the defendant did no more than to copy from publications made in other papers, and that this is not sufficient to sustain a charge of libel, and the trial court was therefore justified in directing a verdict. No authorities are cited in support of this position. An examination of the question has convinced us that the rule is well established that it is no defense to show that a defamatory publication was first made by another person or newspaper and was simply copied with proper credit. Under some circumstances

such fact may undoubtedly be considered in mitigation of damages, if pleaded for that purpose, but it is not a complete defense to the action. *McDonald v. Woodruff,* 2 Dill. (U. S.) 244; *Atkinson v. Detroit Free Press Co.,* 46 Mich. 341; *Hotchkiss v. Oliphant,* 2 Hill (N. Y.), 510; *Sans v. Joerris,* 14 Wis. 722; *World Publishing Co. v. Mullen,* 43 Neb. 126.

It is further insisted by the defendant that the matter complained of was privileged, and that being so, the law does not imply malice in its publication, the burden being on the defendant to show malice. The law relating to privileged communications is generally classed as follows: (1) When the author or publisher acts in the *bona fide* discharge of a public or private duty, legal or moral, or in the prosecution of his own rights or interests; (2) anything said or written by a master giving the character of a servant who has been in his employ; (3) words used in the course of a judicial proceeding; (4) publications duly made in the ordinary mode of parliamentary proceedings; and a qualified privilege extends to reasonable comment made on the acts of a public official or of one who presents himself as a candidate for a public office. The extent to which the cases go in relation to a candidate for a public office is that, where a person, knowing or believing that a candidate for public office is guilty of conduct affecting his fitness for the position, communicates that knowledge or belief to the electors whose support the candidate is seeking, the publisher, acting in good faith in the discharge of his duty to the public, may make such reasonable comments and give such information as comes to him from a reliable source, and which he believes to be true, for the purpose of informing the voters of the fitness of the candidate. In the case under consideration the plaintiff was not a candidate for office, and there was no moral or legal duty resting upon the defendant to publish to the world defamatory matter affecting the character or reputation of one whose only relation to the public is that of a private citizen, and, as is said in *Morse v. Printing Co.,* 124 Ia. 707:

"If one assumes the responsibility of proclaiming such matter from the housetops, or through the public print, the law affords him no defense except upon proof of the truth of the publication."

It is also urged in argument that the defendant, being the publisher of a newspaper and a supporter of J. J. McCarthy, a candidate for congress in the district where the publication was made, owed a duty to the electors to publish a refutation of the slanderous charges made against the candidate for the benefit of his readers and the voters of that district.   In the language of *Morse v. Printing Co.,* *supra:*

. "This proposition is without support in principle or precedent.   The publisher has no right to publish in his paper matters or statements which he or any other citizen would not be justified in circulating by letter or by posting upon the blank walls of the city.   Our constitution guarantees to every person liberty 'to speak, write, and publish his sentiments on all subjects,' but holds him 're-sponsible for the abuse of that right.'   *   *   *   'Liberty of the press' has never been held to mean 'that the publisher of a newspaper shall be any less responsible than another person would be for publishing otherwise the same libelous matter.'   The contrary rule has been affirmed by the courts of this country and England with great uniformity."

Any explanation or exposure of the falsity of the reports concerning J. J. McCarthy, the defendant could undoubtedly publish without being liable to anyone, but when, in justification of the character of a candidate, a publisher libels and defames the character of another, he becomes liable in damages for such breach of the law, unless he can establish the truth of his charge.   It is clear to us that the case made by the plaintiff's petition and the evidence introduced was one that should have been submitted to the jury under proper instructions, and that the judgment should be reversed and the cause remanded for another trial.

We recommend a reversal of the judgment and remanding the cause to the district court for further proceedings.

ALBERT, C., not sitting.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED.