GEORGE L. FARLEY V. JOHN D. MCBRIDE.

FILED JUNE 8, 1905. No. 13,714.

1. **Candidates for Office: LIBEL.** The manner in which a public officer conducted the duties of his office is a fair subject for comment by the press when he is a candidate for reelection, and a newspaper is justified in calling the attention of the public to illegal charges made by him as a reason why he should not again be chosen.

2. **Libel.** Where a newspaper states, in substance, that the sheriff of the county, who is a candidate for reelection, had obtained from the county a certain sum of money upon a false and "imaginary" account for expenses which he had never incurred, this is a charge of moral turpitude and dishonesty, and, if false, is libelous *per se.*

7

ERROR to the district court for Cass county: PAUL
JESSEN, JUDGE. *Affirmed.*

*Byron Clark, A. L. Tidd* and *C. S. Polk,* for plaintiff
in error.

*Samuel M. Chapman* and *Matthew Gering, contra.*

LETTON, C. ⁻

This is an action for libel. John D. McBride, plaintiff
below, at the time of the publication of the alleged libel,
was the sheriff of Cass county, and was at that time a
candidate for reelection. The defendant below, George
L. Farley, was the editor and publisher of the Evening
News, a newspaper published at Plattsmouth, Nebraska.
The publication which is complained of is as follows:
"Question of Fees. The question of the sheriff's fees in
the Shepard case has been under discussion on our
streets for several days, and having gathered some infor-
mation from the county records, and from parties more
or less familiar with the particulars, the News has the
following to offer:

"On the 18th day of April Shepard was complained
against for daylight burglary with intent to steal. The
next day (Sunday) Mr. McBride went to Malvern, Iowa,
and arrested him. Besides fees, known or admitted to be
legitimate, he charged $15 'mileage' and $18.50 'expense.'
The legal fee for mileage for that distance is $2.30. The
expense seems to be a fiction, created in the fertile mind of
McBride himself. One item of this imaginary 'expense'
is $1.50 hotel bill. Shepard was not taken to a hotel by
McBride, nor was he furnished any meals by him until
the next day in the jail at the expense of the county. Mr.
McBride, it appears, did not go to a hotel while in Mal-
vern, but ate supper with deputy sheriff Bushnell of that
town, on invitation, and even if he had done so the county
would be under no obligation to pay the bill.

"Another item of expense is 'railroad fare for prisoner' $2.65. The C., B. & Q. railroad apparently took advantage of Mr. McBride's inexperience by charging him $1.96 too much, the regular fare being only 69 cents.

"Another item is $1.50 for 'livery.' This must be pure 'pad' as he hired no livery.

"Still another item is $1.50 for 'hack hire.' This, if paid at all, was for a hack in Plattsmouth. Shepard was put into a hack upon his arrival here, without request, and driven two blocks to the jail. Such kindness to a prisoner in the matter of hacks is quite unprecedented, and was a McBride invention both in kindness and expense.

"Shepard is charged with a daylight offense. Mr. McBride's transaction was a daylight effort, but here the parallel ends. Shepard is charged with 'evil intent' but got nothing. McBride received a nice little compensation which was paid by the taxpayers of the county. Shepard is now under bond, awaiting trial, and may be sent to the penitentiary, while McBride is running for sheriff on his honesty and efficiency as a public official."

After the article was published, McBride wrote a letter to the defendant demanding a retraction, and attached to the letter an itemized statement and explanation of the fees and expenses charged in the return to the warrant for Shepard's arrest. A retraction was refused, and subsequently this action was brought. The defendant justifies the publication as a just criticism of the acts of a public official, asserts that it was made without malice, and that the charges made as to the collection of illegal fees and expenses are true.

It appears that the matter of the charges made by Mr. McBride as sheriff had been a matter of discussion before the publication of this article, and that the defendant had been advised by different attorneys that the charges made in the Shepard case for money paid to the deputy sheriff in Iowa and for expenses and mileage incurred outside of the state of Nebraska were illegal. It does not appear that any attempt was ever made by the defend-

ant to ascertain whether or not the sheriff had actually paid out the money for expenses which he charged in his bill.

The evidence shows that in April, 1903, Shepard was accused of an attempt to perpetrate a daylight burglary at Weeping Water, Nebraska; that upon information being given to the sheriff of the fact that such an attempt had been made, and that Shepard was suspected of being the criminal, he immediately took steps to ascertain his whereabouts, went to Auburn and Lincoln in the search for Shepard, and sent out directions to local peace officers in that vicinity to arrest and hold Shepard if within their reach; that under the direction and advice of the sheriff to a local deputy sheriff Shepard was found near Malvern, in the state of Iowa, and that on receipt of this information McBride went to Iowa, and with this deputy made the arrest, the prisoner consenting to return with him to Nebraska without a requisition upon the governor of that state. In looking for Shepard, and in procuring his arrest and return to Nebraska, the sheriff incurred a number of expenses, such as $4 paid for watching Shepard's house at Weeping Water, $10 paid deputy sheriff of Mills county, Iowa, for his aid, $1.50 for hack hire, $1.50 for hotel expense, 20 cents for telephoning, and $2.65 for railroad fare. From an examination of the bill of expenses submitted by the sheriff it is clear that for part of the items of expense there was no legal liability upon the part of the county to reimburse him, while at the same time it may be said that the sheriff had actually paid out the money, and that it was not unreasonable for him to think that he should be reimbursed by the county for his expenditures in that behalf. The article charges that "the expense seems to be a fiction, created in the fertile mind of McBride himself. One item of this imaginary 'expense' is $1.50 hotel bill." This portion of the article distinctly charges that the sheriff had charged $18.50 for expenses, when in fact he had never incurred any, and that the expense was "a fiction" and "imaginary." The

evidence shows this statement to be false and untrue and that he had in fact paid out the money which he charged.

Further than this the article draws a parallel between the man Shepard, who was charged with a felony, and McBride. It is said: "Shepard is charged with a daylight offense, Mr. McBride's transaction was a daylight effort, but here the parallel ends. Shepard is charged with 'evil intent' but got nothing. McBride received a nice little compensation which was paid by the taxpayers of the county. Shepard is now under bond, awaiting trial, and may be sent to the penitentiary, while McBride is running for sheriff on his honesty and efficiency as a public official." To the ordinary mind this language is equivalent to saying that Shepard and McBride are equally guilty of crime; that Shepard is awaiting trial and may be sent to the penitentiary, while McBride is at large.

The question of whether or not the sheriff was entitled to be reimbursed by the county for the money which he had actually paid out for expenses in the attempt to capture Shepard was a question of law. There is no doubt that a part of the charges made by the sheriff against the county were unauthorized by law and were a proper subject for criticism and discussion by the press, more especially when he became a candidate for reelection. So far as the defendant might call the attention of the public to charges made by the sheriff which were not justified by law, he would be protected by the qualified privilege allowed him as the publisher of a newspaper to criticise a public officer; and if his strictures and criticisms were confined within proper limits, and were made without malice and for justifiable ends, no action would lie against him for such publication. The defendant would have been within his rights in questioning the propriety of the charge and allowance to the sheriff of this money for expenses upon the ground that the charge was not one for which the county was legally liable, but he did more than this. He recklessly

and untruthfully asserted that the sheriff had obtained from the county the sum of $18.50 upon a false account for expenses which he had never incurred. This is a distinct charge of moral turpitude, dishonesty and crime which the evidence entirely fails to justify. Further than this the parallel sought to be drawn between the sheriff and Shepard is in nowise justified by the circumstances. The meaning of the language used in this connection is clear and needs no gloss. It places the sheriff and the alleged criminal in the same class, and is entirely indefensible and malicious.

It is proper and right that the acts of public officials should be subject to criticism. It is one of the highest privileges of an active and impartial press to closely watch the acts of public officers, to praise where merit is due, and fearlessly and without favor to point out wherein such officers have failed to do their duty or have attempted to use their positions for private advantage, but this privilege granted to the press for the public welfare is not to be recklessly abused. Every man is entitled to be secure in his property, in his person and in his reputation. Our fundamental law says that "every person, for any injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law." The liberty of the press and the rights of the individual must and do exist side by side. No attack is so hard to resist, so difficult to withstand, nor so far-reaching in its consquences, as that which it is within the power of an unscrupulous writer to make upon one's reputation; and, while the press must not be muzzled, it is the duty of the courts to preserve in so far as may be the rights of the individual and his immunity from unwarranted attack.

Complaint is made by the defendant of certain instructions given by the trial court and of other rulings made during the progress of the trial. An examination of the record convinces us, however, that the rights of the defendant were carefully and scrupulously protected by the district court. Under the facts in this case the verdict of

the jury was clearly right, and a finding for the defendant would have been unwarranted by the evidence. The damages assessed were but little more than nominal, and we are of the opinion that the defendant is not the party who has any cause to complain of the result of the trial. We perceive no error which has resulted to his prejudice, and therefore recommend that the judgment of the district court be affirmed.

AMES and OLDHAM, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.