LEE S. ESTELLE, APPELLEE, v. DAILY NEWS PUBLISHING COMPANY ET AL., APPELLANTS.

FILED FEBRUARY 19, 1916. No. 18120.

1. Libel; PRIVILEGED COMMUNICATIONS: CANDIDATES FOR PUBLIC OFFICES. A public statement to the voters in regard to the qualifications and fitness of a candidate for public office made while such candidate is seeking nomination and election is a communication of qualified privilege.

2. ———: TRUTH AS DEFENSE: BURDEN OF PROOF. If such statement is libelous *per se* and is untrue in fact, the burden is upon the party who makes it to prove, not only that he in good faith believed the truth of the statement, but that he had evidence sufficient to justify a reasonable man in belief of its truth.

3. ———: ———. One who publishes of a candidate for office a statement relating to the candidate's qualifications and fitness for the office is not liable in damages if the statement is true and is made with good motives and for justifiable ends, although such statement is libelous *per se.*

4. ———: PRIVILEGED COMMUNICATIONS: MALICE: BURDEN OF PROOF. A defendant is not liable for publishing privileged communications unless there was actual malice on his part, and such malice must appear before there can be a recovery. If, however, the statements published are false and libelous *per se,* malice is presumed, and the burden is upon the defendant to prove that the evidence of the truth of the statements was such as would justify him in making them, and that he did so in good faith, believing them to be true.

5. ———: ———: CANDIDATES FOR PUBLIC OFFICES. A citizen interested in an election has the right to inform other voters of any well-grounded belief which he has as to the candidate's fitness for the office.

6. ———: ———: ———. If the matters stated as facts are true, or if he has reason to believe that they are true upon the evidence that would justify reasonable men in such belief, he would not make himself liable by stating such facts to the voters.

7. ———: ———: ———. If in stating his belief as to existing facts and conditions he does so in good faith, upon sufficient ground to justify a reasonable man in such belief, he would not be liable in damages for expressing to the voters such belief.

8. ———: PLEADING: INNUENDO. The office of an innuendo in a petition for libel is to explain and apply the meaning of ambiguous or doubtful expressions in the alleged libelous publication. If it attempts to give a meaning that cannot be derived from the language used, such innuendo should be stricken out of the petition on motion.

9. ———: INSTRUCTIONS: INNUENDO. If the statement published is a statement of the belief or opinion of the party making it, and the innuendo assumes that it is a statement of fact, and the instructions of the court also assume that such statement was intended as a statement of fact, such instruction will be erroneous.

APPEAL from the district court for Dodge county: CONRAD HOLLENBECK, JUDGE. *Reversed.*

*Brown, Baxter & Van Dusen, Elmer E. Thomas* and *I. J. Dunn,* for appellants.

*Mahoney & Kennedy* and *Dolezal & Johnson,* contra.

SEDGWICK, J.

The plaintiff had held the office of judge of the district court for the fourth judicial district for about 15 years, and was a candidate for re-election. The defendant Fellman wrote an article in regard to the plaintiff's candidacy, and the defendant, the Daily News Publishing Company published the article in the Daily News, a newspaper published in Omaha. This action was begun by the plaintiff in the district court for Douglas county, and was transferred to the district court for Dodge county. The trial there resulted in a verdict for $25,000 damages and a judgment upon the verdict, from which the defendants have prosecuted separate appeals.

The article complained of was as follows: "I am opposed to the renomination of District Judge Lee S. Estelle because I believe he is for the special interests and against the people. I am opposed to his renomination because I believe he is for the third ward crowd and against their molestation. I am opposed to his renomination because, in common with many other Omaha citizens, I regard the Erdman case a mere 'frame-up' by the third ward crowd. Erdman's real offense as viewed by them was his interruption of their police protected carnival of crime. The witnesses for the prosecution were for the most part gamblers, bartenders and gay sports who consort with them. The testimony of their more reputable witnesses was swept away by men of such standing as Dr. Rigge of Creighton University and Professor Senter of the high school of Omaha. The first jury disagreed. The second jury returned a swift verdict of guilty in one, two, three order. Mr. J. W. Miller, educational director of the Y. M. C. A., was not allowed to sit on the jury. A single man of his type would have blocked the game. Judge Estelle, in the face of these facts, gave Erdman the full limit of the law—fifteen years. I am not indifferent to the peril of myself and to my little ones if I raise my voice against the cohabitation of the gamblers and the courts in the temple of justice, but that is a secondary

matter to me. Judge Estelle ought to be defeated. I am appealing to decent republicans to defeat Estelle in the primaries Tuesday."

The defendants contend that the petition fails to state a cause of action. After their demurrers to this petition were overruled the defendants each filed separate motions to strike out parts of the petition. These motions related principally to the various innuendoes incorporated in the petition. They also complain that the court refused to give certain instructions requested by the defendants, and that certain instructions given by the court were erroneous. For the most part these criticisms in regard to the instructions depend upon the contention that the innuendoes should have been stricken from the petition, and that the petition does not state a cause of action. The publication was during the campaign for nomination in the primaries, and, as has been before stated, the plaintiff was a candidate for nomination. The defendant, Fellman was a citizen and voter of that judicial district, and was, in common with all other citizens, interested in the nomination and election. The communication was therefore what is commonly called a privileged communication, and must be construed in the light of that fact. One who publishes of a candidate for office a statement relating to the candidate's qualifications and fitness for the office is not liable in damages if the statement was true and was made with good motives and for justifiable ends, although such statement is libelous *per se*. If the statement is untrue in fact, the burden is upon the party who makes it to prove, not only that he in good faith believed the truth of the statement, but that he had evidence sufficient to justify a reasonable man in belief of its truth.

"The extent to which the cases go in relation to a candidate for a public office is that, where a person, knowing or believing that a candidate for public office is guilty of conduct affecting his fitness for the position, communicates that knowledge or belief to the electors whose support the candidate is seeking, the publisher, acting in good

faith in the discharge of his duty to the public, may make such reasonable comments and give such information as comes to him from a reliable source, and which he believes to be true, for the purpose of informing the voters of the fitness of the candidate." *Sheibley v. Huse,* 75 Neb. 811, 821.

But there is a corollary to this proposition. The principle has been stated in *Neeb v. Hope,* 111 Pa. St. 145, and quoted and adopted in *Bee Publishing Co. v. Shields,* 68 Neb. 750: "An occasion of privilege will not justify false and groundless imputations of wicked motives or of crime. The conduct of public officers is open to public criticism, and it is for the interest of society that their acts may be freely published with fitting comments and strictures. But a line must be drawn between hostile criticism upon public conduct and the imputation of bad motives, or of criminal offenses, where such motives or offenses cannot be justly and reasonably inferred from the conduct." *Farley v. McBride,* 74 Neb. 49.

A defendant is not liable for publishing privileged communications unless there was actual malice on his part, and such malice must appear before there can be a recovery. If, however, the statements of fact published are libelous *per se,* proof that such statements were untrue is sufficient to cast the burden upon the defendant to prove that the evidence of the truth of the statements was such as would justify him in making them, and that he did so in good faith, believing them to be true. As an interested citizen, it was the right of the defendant to inform the voters of any well-grounded belief which he had as to the candidate's fitness for the office. "I am opposed to the renomination of District Judge Lee S. Estelle because I believe he is for the special interests and against the people" is a statement of opinion. Even if this statement would bear the construction that he believed the candidate was so much in favor of the special interests that he would intentionally favor them in any litigation

99 Neb. 26

before him, which would, of course, be misconduct in office, still, if the defendant so believed and such belief was well founded, or if he frankly stated the grounds of such belief and fairly submitted the matter to the voters, he would not be liable in damages.

The defendant's motion to strike out the innuendoes alleged in the amended petition was upon the ground that "each of the matters sought to be stricken is redundant, immaterial, and irrelevant, and for the further reason that the publication set out in plaintiff's petition is not capable of a double meaning, and is not capable of the meaning given to it by the innuendo allegations, sought by this motion to be stricken from the petition," and was addressed separately to each innuendo alleged.

The first item of the publication and alleged innuendo was as follows: "I (meaning the said defendant Benjamin F. Fellman) am opposed to the renomination of District Judge Lee S. Estelle (meaning this plaintiff) because I (meaning the said defendant Benjamin F. Fellman) believe he is for the special interests (meaning thereby that, in the discharge of plaintiff's official duties as judge of said district court, plaintiff was prejudiced in favor of some litigants) and against the people (meaning thereby that, in the discharge of plaintiff's official duties as judge of the district court, this plaintiff, as such judge, exercised the functions of his office with partiality and favor contrary to law)."

In this clause of the published article the defendant stated his belief, and did not state as a fact that the plaintiff was "for the special interests and against the people." It could not be construed as intending to charge as a fact that "plaintiff was prejudiced against some litigants," or that he exercised his office as judge "with partiality and favor contrary to law."

The court instructed the jury: "If the jury believe from the evidence that said article meant what the plaintiff alleges it to mean and was false, and the plaintiff has suffered some damages thereby, then you should find in favor

of the plaintiff and against both defendants such damages as you believe from the evidence the plaintiff has sustained. The law under such a state of facts would presume that plaintiff has suffered some damage." Also, other similar instructions. By the instruction above quoted it was submitted to the jury to find whether this language, as used by the defendant, should be construed as alleged in the innuendo. The jury must have supposed that the question for them to determine was whether the language charged as a fact that the plaintiff was or had been corrupt in his office. There was properly no such question for the jury upon the statement of the publication, and the jury should have been so instructed. The innuendo in connection with the second statement of the publication is of the same character. Allowing these innuendoes to remain in the petition, and instructing the jury that they were to find whether these statements meant what the innuendoes charged they meant, was clearly erroneous. The jury should have been told that these statements were merely statements of defendant's belief, and that defendant could not be held liable for stating an honest and well-grounded belief as to the qualification and fitness of plaintiff for the office for which he was a candidate. The third statement as to how defendant regarded the "Erdman case," that is, what he believed as to that case, is followed by a statement of the facts upon which he based that belief, and some of his own conclusions drawn from those facts. If he made a true statement of facts as the foundation of his belief as to that case, he could not be held liable for expressing his reasonable belief, and conclusions derived from those facts, and submitting the question fairly to the voters.

The statement upon which he based his characterization of the "Erdman case" is: "The witnesses for the prosecution were for the most part gamblers, bartenders and gay sports who consort with them. The testimony of their more reputable witnesses was swept away by men of such standing as Dr. Rigge of Creighton University

and Professor Senter of the high school of Omaha. The
first jury disagreed. The second jury returned a swift
verdict of guilty in one, two, three order. Mr. J. W.
Miller, educational director of the Y. M. C. A., was not
allowed to sit on the jury. A single man of his type
would have blocked the game." He considered the con-
spiracy or "frame up" of the "Erdman case" to be the
work of "the third ward crowd." He thinks that, "as
viewed by them," Erdman interrupted their "carnival of
crime," and that was their motive in his prosecution.
There is no intimation that he believed that the judge was
in any way connected with these schemes of "the third
ward crowd." He states as a fact the character of the
witnesses for the prosecution of that case, and it seems
to be conceded. by both parties that that statement was
substantially true. Both parties assert that the "third
ward crowd" is a bad organization, as far as the public
interests are concerned. Indeed, both parties by their
pleadings and their evidence make this very prominent.
He then says that the testimony of the witnesses for the
prosecution was swept away by the testimony of certain
men that he names. That might or might not be con-
strued as a matter of opinion and judgment, rather than
a statement of an issuable fact. The next statement, that
the jury in that trial disagreed and that the second jury
returned a "swift verdict of guilty," is not seriously con-
troverted. He then named a juror that he says was not
allowed to sit upon the jury, which is borne out by the
record. The innuendo here alleged, "meaning thereby
that, in sustaining a challenge of the state to said J. W.
Miller on the ground of his incompetency as a juror in
said case, this plaintiff corruptly exercised his judicial
functions in sustaining said challenge wrongfully and un-
lawfully for the purpose of preventing said Erdman from
having a fair trial," presented a question for the jury.
That the trial judge considered the evidence in the "Erd-
man case" sufficient to justify a submission of the case
to the jury does not of itself imply corruption. If Erd-

man was guilty of the crime as found by the jury, a sentence of the full limit of the law does not necessarily mean, and might not be understood to mean, that "plaintiff in the exercise of his judicial office wrongfully and corruptly imposed an excessive sentence upon the said Erdman." These questions should have been submitted to the jury with proper instructions. The following statement, that a "man of his type would have blocked the game," of course, is an expression of opinion. He then says: "Judge Estelle, in the face of these facts, gave Erdman the full limit of the law—fifteen years." That the sentence was 15 years was established by the record. The expression "in the face of these facts" might imply that plaintiff at the time knew all of the recited facts; that the witnesses for the prosecution were for the most part gamblers; that the testimony of their most reputable witnesses was "swept away;" that the first jury disagreed and the second jury returned a "swift verdict," and that the juror named was peremptorily challenged and necessarily therefore excluded. It was a question for the jury to determine whether the meaning was that the plaintiff knew the facts, or merely that the facts existed. The statement then concludes: "I am not indifferent to the peril of myself and to my little ones if I raise my voice against the cohabitation of the gamblers and the courts in the temple of justice, but that is a secondary matter to me. Judge Estelle ought to be defeated. I am appealing to decent republicans to defeat Estelle in the primaries Tuesday." Thus he assumes that, if he is right in his belief that the candidate is for the special interests and against the people, and is for the "third ward crowd" and against their molestation, and that the "third ward crowd framed up" the prosecution against Erdman with the result stated, then there is "cohabitation of the gamblers and the courts in the temple of justice." He appeals to decent republicans and expresses the opinion that the judge ought to be defeated.

The innuendo with the closing statement above quoted is alleged: "Meaning thereby that there existed unlawful relations and intercourse between gamblers and this plaintiff as a judge of the district court of said judicial district, and that such unlawful relations and intercourse wrongfully and corruptly influenced this plaintiff in the discharge of his judicial functions as a judge of said court." The word "cohabitation" may in some connection have a very disgraceful meaning. The jury might well regard it in this connection as an extravagant expression. The primary meaning of the classical words from which it is derived is to have (or have possession of) a common place. Webster's New International Dictionary. Its evident meaning in the connection used is that this plaintiff and gamblers associated together in the building used by the courts. Whether the defendant's meaning was, and the understanding of those who read the article would be, that "there existed unlawful relations and intercourse between gamblers and this plaintiff as a judge of the district court of said judicial district, and that such unlawful relations and intercourse wrongfully and corruptly influenced this plaintiff in the discharge of his judicial functions as a judge of said court," should have been submitted to the jury with proper instructions.

The plaintiff contends that the fact that defendant testified at the trial that he did not believe that the plaintiff was guilty of corrupt practices in his office as judge establishes that defendant did not believe that the plaintiff was "for the interests and against the people," and did not believe the other matters which he stated as his belief in the article complained of, and that therefore his statements of his belief are shown by his own evidence to have been wilful and malicious. The defendant was not asked whether he believed that the plaintiff was "for the interests" when he made that statement, nor in what sense he used that expression. The language used by him, under the familiar vernacular of the times, might mean that he believed that the plaintiff's social or business affili-

ations were with those who represented special, as distinguished from the public, interests, and that he was, or might be, unconsciously, rather than corruptly, influenced thereby. The defendant's denial upon the witness-stand that he believed the plaintiff to be corrupt in his office should be regarded as his construction of the language used by him, rather than an admission that he did not in good faith believe what he stated to the voters that he did believe.

The communication being one of privilege under the circumstances, it follows from what has been said that the question of the liability of the defendant Fellman depends upon his good faith in writing and publishing the articles complained of. If the matters stated by him as facts were true, or if he had reason to believe that they were true upon evidence that would justify reasonable men in such belief, he would not make himself liable by stating such facts to the voters. If in stating his belief as to existing facts and conditions he did so in good faith, upon sufficient ground to justify a reasonable man in such belief, he would not be liable in damages for expressing to the voters such belief. Whether the published comments made as beliefs or conclusions were honest expressions of opinion made in good faith, and not without foundation, and were such as a fair man, though entertaining extreme views, might make honestly and without malice, were questions for the jury. This principle was entirely ignored in the instructions, though defendant suggested several upon the point. By instruction 14 the jury were told unqualifiedly that, if they believe the article was false, plaintiff would be entitled to recover. This excludes entirely the idea of privilege, and of exoneration of Fellman if he believed upon good and reasonable grounds his statement to be true. Those matters should have been made plain to the jury. The questions to be submitted to the jury are: (1) Did the defendant, in the several statements of what he believed and as to what he regarded as a fact, state in good faith what he be-

lieved as to those matters and upon sufficient ground, under all the circumstances, for such belief? (2) If the fact was that the juror in the Erdman trial was challenged for cause, then would this defendant in that connection be fairly understood to charge this plaintiff with an improper motive in excusing said juror, and, if so, did the defendant act wilfully and maliciously in making the statement that the juror was not allowed to sit in the case? (3) Did the language used by defendant suggest to those who read the article that the judge, when he sentenced Erdman, knew the facts recited in the statement as to the conspiracy of the third ward crowd to convict Erdman, and would those who read the article so understand it, and, if so, did the defendant act wilfully and maliciously in stating those facts and the severity of the sentence? (4) Would the expression, "the cohabitation of the gamblers and the courts in the temple of justice," under the circumstances, and in connection with the whole article, be understood by those who read it to charge "that there existed unlawful relations and intercourse between gamblers and this plaintiff as a judge of the district court of said judicial district, and that such unlawful relations and intercourse wrongfully and corruptly influenced this plaintiff in the discharge of his judicial functions as a judge of said court," and, if so, did the defendant act wilfully and maliciously in using that expression?

Of course, the entire article must be considered as a whole, and each distinct statement construed in the light of all other statements; but this does not mean that, when a voter states his belief upon a given subject, it must be construed as a positive statement of fact because there are some matters stated as facts in the article complained of. Common sense dictates that we should ascertain what matters are stated as facts, and not treat mere statements of opinion as statements of fact. The newspaper published the article, without comment, as the views of the defendant Fellman. The instructions referred to, in the

light of the construction placed upon the innuendoes by the rulings thereon, were also erroneous as to that defendant. The defendants requested that separate verdicts be submitted to the jury, which was erroneously refused.

The judgment of the district court is reversed and the cause remanded.

REVERSED.

FAWCETT, J., concurring.

I concur in the judgment of reversal, but not in all of the reasoning upon which such reversal is based. I concur in the reversal upon two grounds:

1. The jury were not as concisely instructed as they should have been. I deem it unnecessary to set out the instructions and consider them in detail. The opinion states, succinctly I think, the issues that should have been submitted to the jury, viz.: (1) Did the defendant, in the several statements of what he believed, state what he believed as to those matters upon sufficient ground, under all the circumstances, for such belief? (2) If the fact was that the juror Miller, in the Erdman trial, was challenged for cause, would the language used by defendants in that connection be generally understood by the readers of the publication to charge plaintiff with an improper motive in excusing said juror, and, if so, did defendants act wilfully and maliciously in making and publishing the statement that such juror was not allowed to sit in the case? (3) Would the language used by defendants suggest to those who might read the article that plaintiff, when he sentenced Erdman, knew the facts recited in the article as to the conspiracy of the third ward crowd to convict Erdman, and would those who read the article so understand it, and, if so, did defendants act wilfully and maliciously in publishing those facts and in referring to the severity of the sentence in connection therewith? (4) Would the expression, "the cohabitation of the gamblers and the courts in the temple of justice," under the circumstances, and in connection with the whole

article, be understood by those who read it to charge that there existed unlawful relations and intercourse between the gamblers and plaintiff as a judge of the district court of said judicial 'district, and that such unlawful relations and intercourse wrongfully and corruptly influenced plaintiff in the discharge of his judicial functions as a judge of said court, and, if so, did the defendants act wilfully and maliciously in publishing the same?

2. The verdict is excessive. Punitive damages are not recoverable in this state. The measure of recovery is the actual damage sustained. The published article was designed to defeat the nomination and re-election of plaintiff. It failed in its purpose. Its failure was plaintiff's vindication. The evidence fails to show actual damages sufficient to sustain the verdict.

After a second careful examination of the record, I am impressed with the conviction that the merits of this important case can be made more clearly and satisfactorily to appear by a retrial of the issues involved.

LETTON, J., concurs.

BARNES, J., dissenting.

I cannot concur with the majority of the court, and my reasons for dissenting, briefly stated, are as follows: The libelous article set out in full in the majority opinion is construed by considering its several words and sentences separately, and in a way that, to my mind, will not bear the test of judicial investigation. The published article should be taken up as a whole, and all of its words and sentences should be construed together. There may be sentences in the article which, standing alone, possibly could not be construed as libelous and might not have caused the institution of a suit like the one we are considering. To my mind, all parts of the publication should be considered as forming the foundation for the concluding charge in the article. All related to plaintiff's manner of discharging the duties of his judicial office so as to favor "the special interests," the gamblers and dis-

reputable persons constituting the "third ward crowd," and to aid them in getting out of the way any member of the gang who should turn against them and attempt to aid in their undoing. When so taken and construed, I am of opinion that it constituted a direct charge of misconduct in office.

It must be borne in mind that what is termed in the article as the "third ward crowd" was understood and believed by the citizens of Omaha to be composed of gamblers, thieves and criminal violators of the laws of this state, together with other persons of disreputable and criminal character. In justification, defendants offered the evidence of one of the "third ward crowd" to prove that fact. The article charged that Judge Estelle was friendly to that crowd. It alleged, in substance, that the police force, acting with that element, had charged one Erdman with a criminal offense; that on the trial of that case, at which Judge Estelle presided, he had prevented one J. W. Miller from serving as a juror in the case, and if Miller had been retained on the jury he would have blocked Erdman's conviction. The article further charged that, notwithstanding the fact that the evidence was insufficient to sustain the conviction, Judge Estelle sentenced Erdman to a term of 15 years in the penitentiary, which was the extreme limit of the law for the offense charged. If this does not charge plaintiff with corruption and misconduct in office, I fail to understand the meaning of the English language.

The article in question starts out with the statement: "I am opposed to the renomination of District Judge Lee S. Estelle because I believe he is for the special interests and against the people." It concludes with the charge: "I am not indifferent to the peril of myself and to my little ones if I raise my voice against the cohabitation of the gamblers and the courts in the temple of justice, but that is a secondary matter to me. Judge Estelle ought to be defeated. I am appealing to decent republicans to defeat Estelle in the primaries Tuesday." Without further ref-

erence to the publication, I am clearly of opinion that it was libelous *per se.*

In determining whether the printed declarations were libelous, the courts will not resort to any technical construction of the language used. The publication should be read in court as it would be read elsewhere. The language itself is to be construed in its ordinary and popular sense, and the question is whether the language, when so construed, would convey, or was calculated to convey, to persons reading it, the charge of misconduct in office. *Pokrok Zapadu Publishing Co. v. Zizkovsky*, 42 Neb. 64; *World Publishing Co. v. Mullen*, 43 Neb. 126; *Barr v. Birkner*, 44 Neb. 197; *Battles v. Tyson*, 77 Neb. 563; *Thorman v. Bryngelson*, 87 Neb. 53; *Thomas v. Shea*, 90 Neb. 823; *Spencer v. Minnick*, 41 Okla. 613; *Baker v. Warner*, 231 U. S. 588.

By its answer the Daily News Publishing Company admitted the facts alleged in the first seven paragraphs of the petition, admitted publishing the article in question, and set the same out in full in its answer. It pleaded the calling and character of defendant Fellman and the part he was taking in political affairs, and alleged that the answering defendant, at the request of Fellman, published the article and believed the statements contained therein to be true, so far as appears from the ordinary import and meaning of the language used. It was alleged that defendant published the article without comment, except the caption which it prepared, viz., "Fellman Urges the Defeat of Estelle;" that it published the same without malice toward plaintiff, in the public interest, and with good motives and for justifiable ends; and that the publication was privileged. It denied that the words contained in the article had, or could have, the meaning or import alleged by plaintiff in his petition, averred that plaintiff was successful at the primary and election, and denied that he was, or has been, in any respect damaged. Defendant Fellman admitted the writing and publication of the arti-

cle in question, and alleged, in substance, that Dennison, with his "third ward crowd," had sufficient influence with public officials to afford protection to persons and corporations so that gambling, the illegal sale of liquors, disorderly houses, and other vices were rarely interfered with, when operated by followers and members of that crowd; that it was well understood in Omaha that the only way to secure the privilege of violating the law was to do so through the "third ward crowd" and its bosses, and one way to secure such privilege was to obey their commands in voting and working for their candidates at primary and general elections. Fellman's answer further alleged that for years prior to August 4, 1911, the "third ward crowd" controlled the vote of most precincts in that ward; that for years the votes of those precincts had been counted for candidates favored by them; that for years prior to the publication in question there had not been a fair, free or honest primary or election in said precincts, and in many other precincts that were under the control of the "third ward crowd;" that during plaintiff's service on the bench he had not taken any action as a citizen, or as a judge, to interfere with or lessen the political power and influence of said "third ward crowd," but, on the contrary, had rendered decisions as a judge on the bench which have aided the members of that crowd to violate the law and to terrorize those who had interfered with such violation; that the plaintiff, as a judge, had been satisfactory to the "third ward crowd;" and that because of the record made by plaintiff in the Erdman case, and in other cases which came before him as judge, and because of the protection which the "third ward crowd" had been able to give to violators of the law without interference from plaintiff, whose duty it was to interfere, defendant Fellman came to the conclusion that plaintiff was not the proper kind of a man to occupy the position of district judge.

The plaintiff's replies were, in substance, a denial of the affirmative allegations of the answers.

On the trial, plaintiff introduced evidence of his professional standing as a lawyer, of his long and satisfactory service as one of the judges of the fourth judicial district, and also as to how the article affected him when he saw it as published by the defendant the Omaha Daily News Publishing Company. The evidence showed that the effect of the published article upon plaintiff was such that he became severely ill in mind and body; that it caused him such great anguish that he was unable to perform his duties as judge of the district for about six weeks; that the result of the publication was such as to nearly cause his defeat for renomination and election; that he ran many votes behind his associates, and but for the fact that he had served the people of his district for twelve years, and was well known as an upright and conscientious judge, the publication of this article would have accomplished its purpose and he would have been defeated.

The defendants testified in their own behalf, and both stated that, when the article was written and published, neither of them believed that the plaintiff had ever been guilty of corruption or misconduct in office, and it appears that the matters charged in the publication, so far as they related to plaintiff, were untrue. This was sufficient to show malice. *Whiting v. Carpenter,* 4 Neb. (Unof.) 342; *Sheibley v. Fales,* 81 Neb. 795; *Thomas v. Shea, supra.* This also disposes of the appellants' claim that the article published was privileged.

The rule in some courts is that a public statement to the voters during an election campaign as to the qualifications and fitness of candidates for election to office is one of qualified privilege; that one who publishes a statement relative to a candidate's qualification and fitness for office is not liable in damages if the statement be true and is made with good motives and for justifiable ends; and decisions can be found that hold this to be true, although the statement on its face would be what might be termed libelous *per se;* but even those cases hold that, if such statement is in fact untrue, the burden is upon the one who

makes it to prove, not only that he in good faith believed the statement to be true, but that he had evidence sufficient to justify an ordinarily prudent and fair-minded man in believing in its truth. When the published statement is libelous *per se,* that is to say, is untrue when published, and the one who publishes it does not in fact believe that the one against whom the published statement is directed has been guilty of any wrongdoing, or when the person charged is a public official, and the person publishing the article does not believe that he has been guilty of any malfeasance or misfeasance in office, the doctrine of qualified privilege has no application, and the one publishing the statement is subject to the general rule of law in relation to libel. In an action for damages for libel by one holding a public office, where the defendant testifies that at the time of publishing the libelous article he did not believe that the plaintiff had ever been guilty of either malfeasance or misfeasance in office, there is no room for the application of the rule that where one publishing a statement as to another merely states his belief as to existing facts and conditions, in good faith and upon sufficient ground to justify a reasonable man in such belief, he will not be liable in damages for expressing such belief to the voters at a pending election. It is a travesty to hold that a party should be excused on a plea of good faith or upon evidence which might be thought sufficient to justify reasonable minds in believing the truth of his publication, when he himself, in fact, did not believe it was true at the time he made it. Courts should not permit such subtle distinctions to control their decisions.

What are the facts in this case? The defendant Fellman at the trial testified as follows: "Q. Did you at the time you wrote this article believe that Judge Estelle had been guilty of any corrupt acts or illegal acts in the discharge of his official duties as a judge? A. I did not. * * * Q. Did you believe that Judge Estelle had been guilty of any crime in the discharge of his official duties when you wrote this letter? A. I did not. * * *

Q. Did you have in mind or believe at the time you wrote this letter that Judge Estelle had been guilty of any misfeasance or malfeasance in office? A. I did not." Mr. Polcar, who at the time of the publication of the notice was, and for ten years prior thereto had been, managing editor of the defendant publishing company, and who at the time of the trial was the president and only resident director of the company, testified at the trial as follows: "Q. I think you testified in your direct examination that you did not believe Judge Estelle guilty of corruption in office? A. I don't believe so. Q. You don't believe he ever was guilty of any malfeasance in office? A. No, sir. Q. You don't believe he was ever guilty of any misfeasance in office? A. No, sir." This testimony, given by the two men who are responsible for the publication, entirely eliminated from the case the doctrine of qualified privilege. And, there being no evidence in the case showing that the charges made in the published notice were actually true, the defense that the notice was published from good motives and for justifiable ends, as I view the case, entirely failed. It would be an absurdity to hold that a statement which is libelous upon its face could be published for justifiable ends when it in fact was not true, and when the ones who published it did not believe it to be true. In this condition of the record, the trial court should have instructed the jury that the published statement was libelous per se, and should have submitted to them the one question only, viz., the amount of plaintiff's damages. If I am correct in this view of the matter, then the discussion of the innuendoes set forth in plaintiff's petition is beside the mark, and the instructions of the trial court which are set forth in the opinion of the majority and which are relied upon for reversal of the judgment, if erroneous at all, could only affect the plaintiff's rights and are most favorable to the defendant.

In Bee Publishing Co. v. Shields, 68 Neb. 750, in an opinion by Oldham, C., concurred in by Barnes (myself) and Pound, CC., and by Chief Justice Sullivan and Judges

Holcomb and Sedgwick, we held: "An occasion of privilege will not justify false and groundless imputations of wicked motives or of crimes against public officials in the performance of their duty. While the conduct of such officials is open to criticism, a line must be drawn between hostile criticism upon public conduct and the imputation of bad motives or of criminal offenses to officials."

In *Mertens v. Bee Publishing Co.*, 5 Neb. (Unof.) 592, we held: "The doctrine of qualified privilege applicable to communications in a newspaper regarding a candidate for public office does not extend to statements injurious to reputation or character if such statements are false in fact."

The record shows that the defendants sought to justify the charge relating to the trial and sentence of Erdman by offering testimony as to the vicious and criminal character of what they termed the "third ward crowd." As we view the evidence, it shows that no substantial fact existed which would justify the publication, and the jury were warranted in returning a verdict for the plaintiff.

That Fellman was the writer of the article is admitted; that he wrote it to be published in the Omaha Daily News, and that the editor in chief of that newspaper was vested with complete authority to say whether the article should or should not appear in the paper. He testified that Fellman brought the letter and handed it to him; that he read it and hurried it into the composing room. The purpose of Fellman in writing the letter, and of the editor in publishing it, was to defeat the plaintiff in the primary and at the election; the purpose of one was the purpose of both of the defendants. There could be no separation on the ground of qualified privilege, because neither of the defendants was privileged to write or publish the article in question. There was no ground on which to separate the defendants in determining plaintiff's damages.

That the publication failed to accomplish its purpose in this particular instance should not be urged in excuse

99 Neb. 27·

or mitigation. That it did come very near producing the result is true. That it did not entirely do so was doubtless because of the fact that the judge was well known in his district, where he had lived and in which he had served for many years. It will not do to lightly pass over an offense of the kind under consideration, nor to enter into any nice mathematical computation in considering the amount returned by the jury as compensation for the wrong done. The record shows that the trial was had in a district other than the one in which plaintiff resided, before a fair-minded and unprejudiced jury. The presiding judge was a man of many years of experience and well learned in the law. To my mind the instructions contain no reversible error, and the judgment of the district court should be affirmed.

MORRISSEY, C. J., concurs.

HAMER, J., dissenting.

The thing charged in the article published and on which the action for damages is based is, in substance, the co-operation of the courts and gamblers in the temple of justice, that is, in the court house. The Erdman case is referred to, and it was claimed in the article published that that case was a "frame-up," that is, a prosecution for an alleged crime without any evidence or reason upon which to found it. The conclusion must be from these statements that Judge Estelle and the gamblers tried Erdman and secured his conviction and sent him to the penitentiary when they knew he was not guilty; the judge fixing the penalty at 15 years in prison. This is official corruption, and if Judge Estelle is guilty he should be condemned by everybody and be imprisoned and disbarred, and sent to the penitentiary himself. On the other hand, if a great newspaper like the Omaha Daily News makes a charge of this kind against a judge who is a candidate for re-election, and thereby seeks to defeat him, it should know that the charge is well founded, or, at least, have substantial reason to believe that it is well founded. If

such a charge is made without reason, it is indefensible. Of course, the newspaper has a right to defend itself; but if it does the wrong complained of, it should be severely punished. As it is a corporation, there is no way to get at it, except to inflict the payment of damages upon it. If a newspaper publishes a charge of this kind without sufficient justification, it thereby is likely to defraud the voters out of an honest choice. The voter is interested in the selection of the judge. To charge that the judge is corrupt is to tell the voter that the judge is unfit for office, and that he ought to be defeated. Judge Estelle had held the office of judge of the district court in Omaha for a great many years. He desired to be nominated and re-elected, and he became a candidate. While he was nominated and re-elected, the publication of this matter probably cut down his majority very much. Many voters doubtless declined to vote for Judge Estelle and voted against him because of what they saw in the News. There may be something of a belief that, if a man becomes a candidate for any office, the public have a right to make him run the gauntlet and to stick splinters into him which are on fire. The writer remembers that Abraham Lincoln was charged when he was first a candidate for president with being a very bad man, a blackguard, a clown, a man without patriotism. He was held to be a man of low character beneath the consideration of respectable people. Nothing too opprobrious could be said of him. As a matter of fact, he was a leading lawyer in the little city in which he lived. He was a strong politician. He was a born statesman. He was patriotic to an infinite degree. He had superb courage, and with the logic of a statesman he combined that beauty of expression which is seldom found, except with poets and men who love literature in the highest degree. Ever since the day he was assassinated his memory has been eulogized by the people of the United States and the intelligence of the world. I know of no good reason why a candidate should be held up to the public gaze as a malefactor. It is time that there

should be a reform. There will never be a reform unless it commences somewhere. We have just as much right to commence here as our grandsons will have when they become old enough to be charged with the responsibility of government. When we can truthfully charge our judges with official corruption on the bench, we indicate that there is no certainty in government and that the depths of dishonesty are all about us.

In *Battles v. Tyson,* 77 Neb. 563, the article complained of read: "I want it understood that I am not running a gambling house, and that if a girl could not have decent company she has no business to have company at all; that she had three men in her room with her. * * * She was locked up in her room with three men in my house, and after they had gone I found an empty whiskey bottle on her table." In that case it was held that the meaning of the words intended by the defendant and the understanding of those who heard him should be left to the jury. The petition which charged the use of the words above set forth was held to charge a cause of action, and the judgment of the district court sustaining a demurrer to the petition was reversed.

It is contended by the appellant that the several sentences which are preliminary to the main charge of cooperation and dishonesty in the conviction of Erdman are not, taken by themselves, libelous. It is also said that they cannot be used to add a meaning to the words which make up the charge of corruption and dishonesty on the part of Estelle in the discharge of official acts belonging to the office of judge. The contention seems hypercritical. It is not fair to take up these sentences one at a time and discuss them as if they were not connected with each other, and as if they were also not connected with the charge of official corruption. In the article is the language: "I am opposed to the renomination of District Court Judge Lee S. Estelle because I believe he is for the special interests and against the people." It is said that the foregoing is not libelous. Standing by itself, there is no objection to

it. It might state a reason why the voters should not support the candidate. The mere fact that Estelle took sides in his personal belief against one party and in favor of another would not charge anything of a criminal or dishonest nature. But it should be remembered that the apparent purposes of this introductory sentence was to involve Estelle with the "third ward crowd." It is said in the article: "I am opposed to his (Estelle's) renomination because I believe he is for the third ward crowd and against their molestation." This clinches the matter. The purpose of the article is to identify Estelle with the special interests, and then to show that the special interests are the "third ward crowd," and on top of that to show that the "third ward crowd" are living in a "carnival of crime," that is, that they stand for the violation of the law. The Erdman case is described in that article as a "frame-up." It is seemingly meant by that that it is without foundation; that the real offense which Erdman had committed was not a violation of any law, but an interruption of the "third ward crowd" in the "carnival of crime" which it is claimed that they enjoyed. Estelle's co-operation with the third ward people in their alleged "frame-up" against Erdman is inseparably connected with the whole story. Each sentence describes a step in the alleged corrupt purpose and conduct of Estelle in the prosecution, conviction and sentence of Erdman.

Estelle is charged with not allowing Mr. J. W. Miller to sit on the jury. The language used is: "Mr. J. W. Miller, educational director of the Y. M. C. A., was not allowed to sit on the jury. A single man of his type would have blocked the game." The implied charge here is that Miller is an honest man, and that he would have prevented the conviction of Erdman if he had been allowed to sit as a juror, but that Estelle, being dishonest and corrupt, and being engaged in carrying out the plan of the "third ward crowd," sustained the challenge to Mr. Miller on his *voir dire* examination. Nothing could be more libelous than this. Estelle was charged with being the willing tool of

a body of men engaged in carrying out a criminal conspiracy. The article purports to deal with the trial. It was a trial where Estelle presided as judge. He is described as making a ruling in his capacity as judge. This ruling is claimed to be part of the conspiracy. It is a step toward the conviction of Erdman in a case where there is an alleged "frame-up," that is, a charge against a man on trial which is without evidence to support it. Estelle, according to the article, is made a tool of an alleged band of lawless gamblers engaged in protecting vice. The conclusion is that Estelle and the gamblers fixed up the job on Erdman and sent him to the penitentiary for 15 years.

In the opinion it is said, in substance, that the exclusion of Miller as a juror could properly be considered by the public in determining whether the judge acted honestly or corruptly. To leave the uneducated populace to determine whether the exclusion of a proposed juryman is according to law is to rob the courts of the power which they are bound to exercise in the protection of litigants and those charged with the violation of the law. The policy of allowing men who are uneducated in the law to determine whether a proposed juror has been rightfully excluded on his *voir dire* examination may certainly well be doubted, and it should not be permitted where there is no fact upon which to base it.

The case of *Thomas v. Shea,* 90 Neb. 823, is not unlike the instant case. This court held the publication to be libelous *per se* as a matter of law. The same need to protect Thomas in that case and to punish the offender exists in this case. We should be as willing to protect a judge from a charge of dishonesty and corruption as we are to protect a lawyer. Thomas was a lawyer. In that case the libel was published a few days before the general election in 1908. The defendant was a member of the county board of Harlan county, and the plaintiff was a candidate to succeed himself as county attorney. He was the candidate of the democratic, people's independent and repub-

lican parties. The statement in the opinion is that the libel in that case is ·a six-column document resembling in appearance the front page of a metropolitan daily. The paper was addressed, "To the Taxpayers of Harlan County." There was in it the statement that the plaintiff would never have received the nomination of any party had the honest citizens of Harlan county known how he served them as county attorney during the past two years. There was then a description of five cases, in each of which it was charged that Thomas had neglected his duty and done something which resulted in disaster, and the reason of it was the fault of county attorney Thomas. The article said that he had gone into the five cases, which are described, and had found facts sufficient to "convince any fair man that County Attorney Thomas, in the five cases cited, gave the county, who pays him his monthly salary, the worst end of the· bargain. And, as a matter of fact, Mr. Thomas could not have rendered a greater service to the opposition had he been actually retained by them and accepted their money. * * ˙* But history chronicles successful revolutions. Should this revolution be brought about, the taxpayers of Harlan county will witness a grand exodus of jury fixers, political porch climbers and petty criminals such as this county never wit- nessed before in its history."

The defendant admitted in his answer that he caused the article to be printed and distributed throughout Har- lan county. He also did just what was done in this case. He pleaded that the plaintiff was a candidate for the office of county attorney, and that the publication was a "privi- leged communication." Then there is an allegation that it was published without malice, and that the communica- tion was made to the electors of the county in good faith for the sole purpose of advising them of the real character and qualifications of the plaintiff for the office he was then seeking. It was a little printing office that published the libel in the case of *Thomas v. Shea.* It is a big printing office that publishes the libel, if there is a libel,

in the case of *Estelle v. Omaha Daily News Publishing Co.* The principle is probably very much the same whether the newspaper is big or little, and whether the procurer of the publication is an editor or a member of the county board.

It was said of the facts in *Thomas v. Shea, supra,* that the evidence justified the findings that the plaintiff had not neglected his official duties to the injury of the county, and that all statements reflecting upon his integrity, motives and conduct, or upon his ability and uprightness, were false. "The entire publication was a vicious assault upon the plaintiff in his profession of attorney at law. It strikes at his means of livelihood. If the accusations are true, he is unfit to be county attorney or to act professionally for an honest client. Those who believe the charges will not employ him, if they want honest service." The logic in the *Shea* case is conclusive and unanswerable. The only trouble seems to be that we are less willing to protect Judge Estelle than we were to protect county attorney Thomas. It may be that the refinements of learning make a visible distinction between the two cases.

In *Sucha v. Sprecher,* 84 Neb. 241, the plaintiff requested the court to instruct the jury that the publication in question was libelous *per se,* and to find a verdict for the plaintiff for at least some amount. The request was refused, and the court in paragraph 4 of its own instructions, allowed the jury to determine whether the article, by giving its language a fair, ordinary and reasonable construction, would be understood by the ordinary reader as charging, or intending to charge, the plaintiff with official misconduct, or misconduct in office. The jury returned a verdict for the defendant, and the plaintiff brought the case to this court on appeal. It was stated in the argument that the language of the publication in question was susceptible of two interpretations, one of which would not render it libelous *per se.* This court said: "This being so, its nature and effect, considered in the light of the evidence,

was properly submitted to the jury." This court affirmed the judgment of the court below.

In *Spencer v. Minnick,* 41 Okla. 613, it is said: "A man cannot libel another by the publication of language, the meaning and damaging effect of which is clear to all men, and where the identity of the person meant cannot be doubted, and then escape liability through the use of a question mark."

That the language used in the instant case means dishonesty and official corruption, see the opinion of the United States supreme court in *Baker v. Warner,* 231 U. S. 588. In that case the plaintiff was the United States attorney for the District of Columbia.

In *Bee Publishing Co. v. Shields,* 68 Neb. 750, this court has rendered two instructive opinions. In the first one, which was prepared by Commissioner Oldham, it is said, quoting *Neeb v. Hope,* 111 Pa. St. 145: "An occasion of privilege will not justify false and groundless imputations of wicked motives or of crime. The conduct of public officers is open to public criticism, and it is for the interest of society that their acts may be freely published with fitting comments and strictures. But a line must be drawn between hostile criticism upon public conduct and the imputation of bad motives, or of criminal offenses, where such motives or offenses cannot be justly and reasonably inferred from the conduct." In that case it was further said: "One must not take advantage of a privileged occasion to exhibit malice toward and to unlawfully and wrongfully injure another by publishing false and defamatory matter concerning him, and that if he does so he forfeits the privilege occasioned and becomes a libeler subject to the ordinary rules of law relating thereto."

The business of a lawyer depends largely upon his reputation in the county and state in which he lives and conducts his practice. If he is a man of ill repute, his business is little and insignificant. If he is doing a good business and is a man of high standing, he will have a chance to earn money enough to support his family, to educate

his children, to start them in life, and possibly enough to enable him to travel or to devote a part of his time to literature or politics. These are the things in life which we value. To tear a lawyer's reputation down by the publication of defamatory matter is an affair of the most serious consequences. His business is destroyed. His ability to support his family and to educate his children is taken away from him, and he stands in the community as one of ill repute having no character to protect. Nearly every lawyer has an ambition to occupy the bench. If he becomes one of the judges of a court of general jurisdiction, or of an appellate court, he is flattered because his neighbors have trusted him to settle their disputes. No lawyer may have a higher ambition than the ambition to serve as a judge of one of the courts of general jurisdiction. In order to run for the position of judge, it is too much to ask of a lawyer that he shall be willing to stand up with a list of malefactors and wrongdoers. What right has a man who engages in the publication of a newspaper to rob a lawyer or a judge of all that he has that is valuable to him in a professional way? If a man steals my horse, he only takes away from me a month's labor, perhaps it is only a week's labor, but, if he takes away from me my reputation as a lawyer or a judge, he deprives me of earning a livelihood. If he does that, he costs me thousands of dollars. If he takes away from me my reputation as a judge, I can never recover from the injury. If he sets fire to my house and burns it down, I can rebuild it with the earnings of a year, but, if he takes away from me my reputation for honesty and integrity, I can never rebuild it; I am ruined for life, and my children are scandalized. This sort of thing can be done with any man who is practicing our profession. I do not care how honest or how capable he may be. A big newspaper circulates in all of the 93 counties of the state. It reaches readers in every town and village. It comes every day. If you or I should be attacked by a newspaper of this sort, we have only time in our short lives to see a small portion

of the residents of the state. The man with his big news-paper has capital behind him; he may have $200,000 or $300,000 behind him; with that he can encompass our destruction. If he can excuse himself in an action brought against him for damages by saying that somebody told. him that we were bad men, then he can destroy anybody. He can start a lie with his henchmen, and then repeat it in his newspaper. The effect of a decision of the sort sought to be rendered in this case is to license the robber with his newspaper so that he may kill and destroy. One running for a local office in a small territory may be able to defend himself against newspaper attack because there are not so many people but that he may go and see them, but he is powerless as against a newspaper with a big circulation. The voter has a right to know that his candidate will be fairly treated, and that the voter will not be robbed or deceived. It should be an honest fight. Be careful you do not lay down a rule here which will invite and justify the destruction of your sons.

Mr. Fellman in his article speaks of peril to himself and his little ones if he raises his voice "against the cohabita-tion of the gamblers and the courts in the temple of jus-tice." To draw a picture of himself and his little ones in peril because he lifts his voice against the alleged im-proper relations of the gamblers and the court (Judge Estelle) in the temple of justice (court-house) is one of the tricks of oratory. No judge except Estelle was spoken of or intended, and Fellman was after Estelle. A libel should be read just like any other printed page, and it is artificial construction to cut it up into alleged innuen-does, and then to profess doubts about what these mysteri-ous innuendoes may mean. The News published the article, and it is clearly libelous, and no condition existed to make its publication one of qualified privilege. Accord-ing to their own story, Fellman and the editor of the paper did not believe that Estelle was corrupt.

If it was erroneous to permit the plaintiff to prove that the directors of the defendant publishing company

were nonresidents of the state of Nebraska; yet I am unable to see how it could injure the company in any way. Unless there was injury to the company in the admission of this testimony, it was error without prejudice. The evidence is insufficient to justify the rule laid down .in the opinion and the syllabus touching the doctrine of qualified privilege. The judgment of the district court should be affirmed.

The record fails to disclose evidence justifying Fellman in writing the letter and causing it to be published, and the News Publishing Company published the letter without having evidence to justify the same. Apparently the . defendant publishing company acted maliciously in publishing the letter, whatever the actual fact may be.

The judgment of the district court in favor of the plaintiff should be affirmed. I adopt the dissenting opinion of Justice Barnes, except as it is herein modified.