Ernest E. L. Hammer, J.
In this action, which has been tried before this court, plaintiffs, originally seven in number but reduced during the trial to four, are members of Local 10 of the International Ladies’ Garment Workers’ Union and also of the International Union. In their complaint plaintiffs allege defendants wrongfully and unlawfully caused certain charges of violations of the constitution and by-laws of Local 10 and of the International Union to b.e served upon them, requiring plaintiffs to appear and be tried before the executive board of Local 10 as a trial committee, by which committee plaintiffs’ objections that the members of the executive board were disqualified as biased, prejudiced and interested in the prosecution of the charges were overruled and plaintiffs required to proceed to trial. Plaintiffs allege the trial, the decision and suspension thereby were invalid and unlawful in that the charges were without any evidence to support them; in that plaintiffs’ statements, which were the basis of the charges, were not libelous or defamatory as charged, but truthful, fair comment and privileged in the exercise of the right of free speech and in the course of an election campaign of officers of Local 10; in that the statements were made concerning members of the executive board who were rival and successful candidates in such election and accordingly disqualified as judges or members of the trial committee; in that under section 7 of article XIII of the constitution and by-laws of Local 10 each was entitled to be represented at the trial by a member in good standing of Local 10, and this was denied and only one such representative was allowed for all; in that one member of the executive board gave testimony and thereafter acted in the deliberations and decision. There are other general allegations that.the charges and decisions were arbitrary, malicious, discriminatory, false and fraudulent ‘ ‘ to cloak the conspiracy of the defendants against the said plaintiffs ”; that the hearings were unfair and biased and plaintiffs were denied a fair trial in that the report of the executive committee to the meeting of the membership was unfair, untrue, misleading and biased; that plaintiffs’ demand at the meeting for a correction was denied and the membership meeting and the suspensions voted were therefore illegal, and more so because plaintiffs’ demand for a vote of the membership by secret ballot was denied. Plaintiffs further allege that the judiciary committee of Local 10, to which they appealed, was unlawful in that the members were appointed by the president of Local 10, one of those con *384 cerning whom the questioned statements were made; in that plaintiffs were not given notice of hearing or a written or oral statement of the charges against them, and the members were biased and prejudiced, dominated and controlled by defendants. Plaintiffs further allege the decision of the grievance and appeals committee of the general executive board of the International Union, to which they appealed, was improper, invalid and illegal in that the members of such committee were under the domination and control and acted under the express instructions and directions of defendants Dubinsky and Nagler, acting in concert with other defendants; in that such decision was delayed from November, 1944, to October, 1945; and in that the charges and previous proceedings were invalid, improper and unlawful. Plaintiffs further allege their suspensions deprived them of the right to attend membership meetings, to participate in the affairs of Local 10 and of the International, of the right to run for office, of other material benefits of membership, and rendered plaintiffs unable to obtain and retain employment and wrongfully interfered with their right to work and earn a livelihood in their trade and occupation. Plaintiffs allege this action is brought because the next convention of the International will not be held until May, 1947, and appeal to such convention (the last appeal within the framework of the Union) will be futile as it will be under the domination and control of defendant Dubinsky and others of the defendants, in that the persons to whom such appeal could be addressed are either such defendants or persons under their control or domination, who are hostile to plaintiffs or have prejudged them.
The relief sought is an adjudication (1) that the charges, proceedings thereon, .and suspensions of plaintiffs were improper, unauthorized and beyond any power or authority conferred on Local 10, the International, or any officer, member or agent thereof, and illegal, null and void; (2) that plaintiffs are members in good standing and entitled to all rights, benefits and privileges of Local 10 and of the International; (3) that plaintiffs are entitled to a permanent injunction restraining Local 10 and the International from continuing the suspensions and acts depriving plaintiffs of their rights, benefits and privileges under their respective constitutions and by-laws; and (4) awarding plaintiffs damages found to have been sustained.
Defendants’ answer denies the allegations of the complaint charging the defendants or any of them with bias, prejudice, unfairness, or with invalid, improper and unlawful acts, either alone or in concert or in conspiracy with other defendants, and all allegations of domination and" control, or that any of the *385 defendants rendered a decision against any plaintiff under instruction Or direction of any other defendant. As separate defenses the answer alleges (1) the plaintiff Louis Nemerson resigned as a member; (2) the period of suspension of plaintiffs Davis and Seligman expired July 6, 1946; and (3) allegations in respect of the charges against plaintiffs. These allegations state that plaintiffs were charged with violating section 1 of article XIII of the constitution and by-laws of the International, of acts and conduct detrimental to the interests of the International and of Local 10; with libeling the officers of the International and the officers of Local 10 in circulars, leaflets, written and printed matter containing defamatory, derogatory and scurrilous statements concerning them in their official capacity, which they wrote or caused to be written and published or distributed. The third defense further alleges the charges in writing were duly filed and served on plaintiffs, who first defaulted in appearance and then, in answer to further notice by registered mail, appeared and refused to plead, demanded a bill of particulars, that each be represented by a Union member, a stenographer to report all hearings or the privilege of furnishing such a stenographer, and a public trial; that a stenographer was provided and a bill of particulars furnished, and the executive board ruled the charges were against the plaintiffs jointly and they were entitled to be represented by only one member as counsel; and that an adjournment of the hearing for two weeks to July 6, 1944, was granted at the request of plaintiffs to enable them to prepare for trial. Allegations are set forth as to the hearing, deliberations and decision of the executive board, the report and decision to the meeting of the membership, and approval by vote of 827 to 23; plaintiffs’ appeal to the judiciary committee, the action taken and decision of affirmance; plaintiffs ’ appeal to the appeals committee of the International, and charges heard de novo with full presentation of evidence and cross-examination by both sides, and the decision of affirmance. These proceedings, defendants conclude, constituted a fair, just and impartial hearing and decision as provided by the constitution and by-laws of the International and Local 10. In a fourth defense defendants repeat the above and conclude that by reason of plaintiffs’ acts and conduct before the various bodies of Local 10, any irregularities before lower bodies were waived; and the hearing de novo before the appellate tribunals cured any irregularities before the prior tribunals. In the fifth defense defendants reallege the above and plead that under section 17 of article XIII of the constitution and by-laws of Local 10 any *386 member shall have the right to appeal to the appeals committee of the International and to the Convention of the International respectively, and plaintiffs have not made such appeal; and not having exhausted the remedies available within the constitution and by-laws of Local 10 and of the International, they are not entitled to maintain this action. The sixth defense is that the decision of the appeals committee was rendered October 23, 1945, and this action was not commenced until October 10, 1946, and that plaintiffs are therefore guilty of laches and not entitled to the relief sought.
Defendants upon this trial stated that they do not press the defense of laches and that of failure of plaintiffs to exhaust all remedies — that remaining being an appeal to the convention of the International in May, 1947, — for the reason that a decision by this court on the merits is desired.
Upon the issues thus presented a trial has been had. At the end of plaintiffs’ case, defendants moved for dismissal as to plaintiffs Nemerson and Davis, who, it was stated, were no longer members of the Union. This motion was granted on consent. Dismissal was later granted as to plaintiff Seligman, whose suspension was ended.
The International Ladies’ Garment Workers’ Union (herein referred to as the ‘ ‘ International ”) is an unincorporated association — a national labor organization. It is composed of more than 418 local unions in all parts of the United States and Canada, and represents a combined membership of more than 320,722 men and women engaged in the different branches of the women’s garment industry. It is governed by a constitution and by-laws duly adopted by a convention of delegates from each of the locals which are directly affiliated with and constitute part of it.
Local 10 is also an unincorporated association and it is affiliated with the International. It is composed of approximately 7,500 members, all of whom are cutters in the various branches of the women’s garment industry. It is governed by a constitution and by-laws which were duly adopted by its members.
The constitution and by-laws of Local 10 and also the International, both of which are in evidence, contain, among other things, provisions defining their aims and purposes, the manner in which they shall be organized for the election of officers and committees, the functions and powers of each of such committees, the rights, privileges and obligations of members, what shall constitute offenses against either organization and the *387 members and officers thereof, and governing disciplinary proceedings against members who are charged with violating the provisions thereof and the successive appeals to appellate committees which may be taken under the said constitutions.
The constitution and by-laws of Local 10 provide that disciplinary proceedings against any of its members shall be brought, in the first instance, before the executive board of Local 10, which is the grievance or trial committee of said local. Determinations of the executive board must then be presented to the membership at a regular meeting, for approval or disapproval. Any member feeling aggrieved by the decision of the membership acting upon the recommendation of the executive board is given the right to have that decision reconsidered by a judiciary committee of Local 10, consisting of five members appointed by the president of the union, with the accused having the right to exercise 10 challenges.
It further provides that a member of the union, who is aggrieved by the decision of the judiciary committee, shall have the right to appeal to the appeals committee of the International. Finally, he may have a further appeal to the convention of the International.
The evidence shows and I find the following: On May 23, 1944, the defendants, Isidore Nagler, Louis Stulberg and Moe Falikman, all officers of Local 10, in conformity with the provisions of the constitution and by-laws of the unions, submitted charges in writing against the seven plaintiffs herein to the secretary of the executive board. These plaintiffs were charged with violating section 1 of article XIII of the constitution and by-laws of Local 10, and section 5 of article X of the constitution and by-laws of the International; with acts and conduct detrimental to the interests of the International Ladies’ Garment Workers’ Union and of Local 10; with libeling the officers of the International Ladies Garment Workers’ Union and the officers of Local 10 in certain circulars, leaflets and other written and printed matter containing defamatory, derogatory and scurrilous statements concerning them in their official capacity, which the above-named accused wrote or published or caused to be written or published and which they otherwise ratified, and with distributing the same or causing the same to be distributed, thereby bringing the International Ladies’ Garment Workers’ Union and the officers thereof, and Local 10 and the officers thereof, into disrepute, contempt and ridicule.
Upon this trial plaintiffs stated they admitted full responsibility for writing, publishing and distributing the statements *388 in the writings. The written or printed statements in the circulars or leaflets which were the grounds or basic counts of the charges against plaintiffs were the following:
Leaflet No. 1 states:
“ * * * we present a 14 point program as a basis for uniting all constructive forces in Local 10 for the coming elections.
‘ ‘ This program cannot be realized unless we establish genuine democrary in our union. Unfortunately, there are those in our union who disregard the most fundamental American tradition of democratic procedure and conduct.”
‘1 Instead of permitting the fullest discussion and expression by the cutters on all vital issues outlined above, the Nagler-Stulberg administration prevents and outlaws discussion on these important matters. The recent persecution of four of our best fighters for the rights of the cutters * * * Leo Schwartz, Harry Shaw, Leo Unker and Arnold Ames # * * was a result of this policy.
“ THE AMES FRAME-UP
‘ ‘ The cowardly frame-up on trumped up charges against the popular and progressive rank and file leader, Arnold Ames, after the Nagler-Stulberg witnesses had repudiated the alleged charges, is characteristic of the complete disregard for democratic procedure.
‘ ‘ It was Manager Nagler who attacked the heroic Soviet trade unions as undemocratic when he mouthed the reactionary Matthew Wolls’ Opposition to Anglo-American-Soviet trade union unity.
“ Such conduct and policy has alienated us from the rest of the progressive labor movement and has put our union in a wrong light.
“ IT IS NOT TOO LATE
“ It is not too late to put a stop to these dangerous policies of persecution, red-baiting, Soviet sniping and flirtations with the appeaser and anti-semitic John L. Lewis.”
“ ERASE THE FRAME-UP AGAINST ARNOLD AMES for the Restoration of All Union Rights to LEO SCHWARTZ, HARRY SHAW, LEO UNKER and ARNOLD AMES ”.
Leaflet No. 2 is headed “ SHAKE-DOWN PROTESTED TO PRESIDENT DUBINSKY ”. This leaflet purported to set out the terms of a private letter written by the defendants to David Dubinsky, president of the International, and to the general executive board of the International, for redress of *389 alleged grievances. The letter is dated February 18, 1944, before any nominations were made for officers of the Local who were to compose the new administration.
This letter contained three headings: (1) “ SHAKE-DOWN PROTESTED TO PRESIDENT DUBINSKY ”; (2) “ RANK AND FILE SAYS NAGLER-STULBERG PLOT 1 JA ’ ELECTION IN LOCAL 10, I. L. G. W. U.”; and (3) “ CUTTERS CLAIM ADMINISTRATION COLLECTED $15,000 FOR CAMPAIGN FUND ”
“ We vigorously protest the undemocratic and illegal methods employed by Manager Nagler and his associates in violation of the rights of the members in connection with the coming elections in Local 10, I. L. G. W. U.”
“ It is clear the Manager Nagler and his clique are determined to prevent a free and democratic election in our union, with the intention to maintain their tyrannical rule indefinitely.”
“ Manager Nagler and his assistants plotted the frame-up on trumped up charges against the leading progressive Rank and File candidate Arnold Ames. They have also suspended or fined three other active Rank and File members, Leo Schwartz, Harry Shaw and Leo Unker. This conspiracy was hatched by Nagler, Stolberg and Falikman in order to eliminate leading opposition candidates. For months past, at every local meeting, Nagler threatened Ames with suspension and expulsion. These threats were made by Nagler and his clique because Ames and Ms co-workers opposed the Anti-Soviet lies and other political intrigues engaged in by Nagler and other officials of the I. L. G. W. U.”
1 ‘ Using the authority of the union and acting in the capacity of Business Agents, officers of our local union are canvassing all shops for ‘ contributions ’ to their election campaign.”
“It is estimated that this shake-down will net the Nagler-Stolberg administration more than Fifteen Thousand ($15,-000.00) Dollars.”
“ Business Agents of the Miscellaneous Division of Local 10, made the rounds of all Miscellaneous cutting departments to collect funds for a banquet in honor of Moe Falikman, charging the cutters $10.00 admission. (The Commodore charged the Falikman Committee $4.00 per plate, netting them a profit of $6.00 per plate.) Caring little whether Falikman reached 50 years of age, and caring even less to celebrate the occasion, hundreds of cutters paid for the invitation but did not attend, giving them a clear profit of $10.00 per invitation. The total take amounted to several thousand dollars.”
*390 ‘ ‘ Assistant Manager Louis Stolberg attempted to intimidate members of the Rank and File campaign committee by calling them to his office for questioning. ’ ’
Leaflet No. 3 is headed “ Administration Machine Runs Riot at Meeting. ’ ’ with sub-headings ‘ ‘ Nagler Bars Ames as Manager Candidate ” and “ Cover Up Shake-Down with Red Herring ”. It also states the following:
“ In the presence of more than 2,000 cutters, the Nagler-Stolberg clique gave a most disgraceful exhibition of machine rule such as would make the old Tammany Tiger look like a lamb in comparison.”
“ The interruption of Rank and File speakers, and the holliganism that was organized by Stolberg-Nagler reminds one of the tactics employed by the Coughlinites against liberal and progressive meetings.”
“ Nagler personally gave the signal to his stooges when he grabbed the microphone from Arnold Ames (without permission of the Chairman), when Ames spoke about the cowardly frame-up engineered against him. ’ ’
“WHAT HAULER, STOLBERU, FALIKMAN FAILED TO ANSWER”
“ Did the business agents visit all shops and shake down the cutters to the tune of more than $15,000? (in violation of the I. U. W. U. Constitution, Article 5, Section 24).
“Is it not true that Falikman’s dinner invitations were peddled by the Business Agents at $10.00 per plate? (The Commodore charged only $4.00 per plate).”
“Is it not true that Nagler, Stolberg and Falikman framed Arnold Ames on trumped-up charges, and made a similar job on three other Rank and Filers? ”
“Is it not true that Nagler, acting as the errand boy of the reactionary Republicans, Matthew Woll and Bill Hutchinson, had the unmitigated gall to attack and slander the Trade Unions of our heroic ally, the Soviet Union?
“ Nagler, who acted as the errand boy for the reactionary Republic Labor Chiefs, Bill Hutchinson and Matthew Woll, spoke against Allied Labor Unity with the Trade Unions of our great ally, the Soviet Union.”
“President Dubinsky and the U. E. B., including Nagler, support the reactionary A. F. of L. top leaders, in their refusal to sit together with the heroes of Stalingrad. They prefer the company of John L. Lewis and Bill Hutchinson. The cartoon below eloquently explains what kind of democracy these bureaucrats prefer.”
*391 On this leaflet is a cartoon representing Nagler behind a push-cart supposedly peddling “ Nagler ‘ Democracy ’ ” or the cart’s contents of (a) “ Suspensions and Fines of Progressives (b) a bag of money labeled “ $15,000. Shake-Down (c) a bunch of manuscript papers entitled “Anti-Soviet Speeches (d) a boiler pot labeled “ Falikman Dinner ”; and (e) an indistinguishable commodity which is labeled “ Frame-Up on Arnold Ames, Chairman of I. L. G-. W. U. Members Committee for American-Soviet Friendship ”. The push-cart also has on it a hammer and a boot.
Leaflet No. 4 states:
“ The Terror Begime of Stolberg, Nagler and Falikman hoped, by their cowardly frame-up (with the approval of President Dubinsky) of the leading progressive candidate, Arnold Ames, to throw fear into the hearts of our members. These cowards judge people by their own moral standards. But they sadly miscalculated. ’ ’
“ The Bank and File was among the first to fight against Fascism and lost one of its Brothers on the battlefields of Spain in 1936, and will not quit the fight for democracy because of casualties. Most of our active members (many of whom were suspended by these cowards) are now proudly serving in the U. S. Armed Forces on the far-flung battle fronts for the cause of democracy. Did this power-drunk and cowardly trio (Nagler, Stolberg and Falikman) expect to frighten such people, men who are not afraid to fight a much more dangerous enemy, and give their lives if necessary for the cause of democracy? ”
After the name, Arnold Ames, for manager, there appears in parentheses the words, “ Taken off the ballot by Nagler ”. After the name, Charles Nemerson, for business agents-cloak, there appears in parentheses the words, ‘1 Bemoved from ballot by Nagler-Stolberg ”. After the names, Jack Feinstein, Louis Nemerson, Dave Perlman, Abe Bosenbaum, Hyman Bosenblum, Joseph Zimberg and Harry Shaw, for executive board-cloak, there appears in parentheses the words “ Bemoved by Nagler ”. After the name, Arnold Ames, for delegates to the convention, there appears in parentheses the words, ‘ ‘ Bemoved by Nagler ”. After the name, Leo Schwartz, for business agent, there appears in parentheses the words, “ Taken off ballot by Falikman ”.
Leaflet No. 5 states:
“It is now definitely established that the Nagler-Stolberg clique will keep me off the ballot in the coming elections of Local 10, ILGWU.
*392 “ This is the fourth time that I have been framed. Twice have I been taken off the job and this is the second time that I have been removed from the ballot.
“ The only two elections in which I participated as a candidate for high office, from 1500 to 1700 members supported my candidacy and the Rank and File program. I consider this a badge of honor and a reward for my loyalty to the membership and my democratic principles and ideals. For had I betrayed the progressive membership and my co-workers and friends; had I agreed to slander the Soviet Union; had I followed the wrecking policies of Dubinsky in the American Labor Party; had I only to keep silent — my reward would have been different. Instead of being slandered and framed, Dubinsky and Nagler would compensate me with a most lucrative official position. On more than one occasion, administration officials tried to win me over to their side with all sorts of offers held out as bait. (At a recent membership meeting Assistant Manager Louis Stolberg let the cat out of the bag when he said: 1 It is true that I have always tried to win Ames over to our side but it is no use.’)
“ Because I could not be bribed nor intimidated, they decided to resort to force. But this frame-up and the suspension of the three other rank and filers is not only directed against us but against all members.
“ The adminstration is anti-democratic because they fear the membership. * * * The Naglers and Dubinskys fear
progress.”
Leaflet No. 6 has headings and sub-headings as follows: “RANK AND FILE CUTTER”; “STOP CHAOS AND MISRULE IN LOCAL 10 ”; “ RANK AND FILE EXPOSES FAKE ‘ TROJAN HORSE ’ ISSUE” —“CALL FOR DEMOCRACY AND AGAINST FRAME-UPS ”.
It then states:
‘1 The administration boasts of another ‘ tremendous accomplishment,’ the relief system. For the past 10 years the Rank and File in Local 10 advocated and fought for an employment committee that would distribute all jobs without discrimination and adequate relief to those failing to get jobs. Instead of adopting our full plan they agreed only to that part dealing with relief. The jobs were and are even today peddled by the officials to their stooges. (At present they cannot keep other members out of work since there are jobs for all.)
*393 ££ It can be stated without exaggeration that the Nagler-Stolberg administration, like its predecessor, the Stolberg-G-oldJacobs-Falikman administration, is hated intensely, if not despised by the membership. Those who openly support them do so not because of respect or friendship but because of fear.
££ Yet this clique has the effrontery to state that ‘ the cutters have confidence in the administration * * * because of the spirit of fairness, impartiality ’ and of all things, listen, brothers —£ respect for the principles of democracy. ’ What a mockery! After the frame-up of Arnold Ames on trumped up charges, the wholesale suspensions of other Bank and Filers, after the disgraceful exhibition of hooliganism at the Nomination meetings they speak of democracy!
£ 1 They favored prolongation of the war by opposing a Second Front in the hope of weakening the Soviet Union even if this may mean the loss of thousands of more lives of American and Allied soldiers as well as those under Hitler’s yoke.
££ They participated with President Dubinsky in the anti-Soviet provocation, together with the pro-fascist Polish exiled government, in connection with the two Polish spies and traitors, Alter, Ehrlich.
££ They support the readmission into the A. F. L. of the appeaser and anti-Semitic John L. Lewis. (Lewis’ return to the A. F. L. was characterized by Max Zaretsky, President of the Millinery Union, as a stab in the back of organized labor.)
“ They oppose unity in the union and national unity.
££ They participate together with Pres. Dubinsky in the disruption of the A. L. P.
‘ ‘ They oppose allied labor unity and the International Trade Union Congress which will take place in June 1944 in England.
££ (All trade unions from the United Nations, including the C. I. 0. will participate, except the A. F. L.)
££ The Bank and File leaders are framed, suspended and discriminated against by the administration but they fight courageously and fearlessly because they know that their cause is right and their fight is just.
“ You members who believe in the great American tradition of fair play and democratic principles will condemn the cowardly frame-up of the courageous fighter, Arnold Ames, and the suppression of democracy by the administration.”
Leaflet No. 7 states:
“ 1. The frame-up and removal from the ballot of our Manager candidate, Arnold Ames, and three other rank and filers.
*394 ‘1 2. The use of Business Agents and the authority of our union for campaign purposes as well as for the collection of funds in the shops. (This shake-down amounted to thousands of dollars.)
11 3. The use of the Union mailing list for campaign purposes by the Administration.
“ 4. Refusal to allow the Rank and File watchers at every station (including the ballot box) during the balloting.
“ 5. The presence of Nagler, Stolberg and other Union officials in the polling place, with the intention of influencing the voters. (This in additon to the pro-Administration election board.)
“ 6. Partiality and interference on the part of the election board in favor of the Administration.
“ 7. The rejection of all proposals by the rank and file that would guarantee honest and democratic elections. (The proposals were based on the election procedure in state and city elections.)
“ These charges were placed before the Election Board of Local 10. The board took no action. Therefore the case will be appealed to the next I. L. Gr. W. U. Convention which will take place May 29th in Boston.
“ The conspiracy of the Nagler-Stolberg Administration to carry through a ‘ ja ’ election in Local 10 was deliberately planned many months before the elections.
“ This conspiracy was aimed in two directions: (1) to produce by fair means or foul an impressive victory in President Dubinsky’s ‘ home ’ local and (2) to play up this ‘ victory ’ in order to influence the outcome in the A. L. P. state primaries in their favor.
“ To achieve these aims they employed not only the entire union apparatus but every foul trick at their command.
“ Their first step was to behead the growing progressive rank and file movement by eliminating through a cowardly frame-up its leading and most popular candidate, Arnold Ames.
“ The next step was to create an atmosphere of terror and antagonism and conduct the elections in a most undemocratic and provocative manner. This was demonstrated at the nomination meeting where rank and file speakers were interrupted by organized cliques of the Administration led by Nagler and Stolberg.
“ The refusal of Nagler and Stolberg to permit rank and file watchers at every station, particularly at the ballot box, was a give-away as to their real intentions.
*395 1 ‘ Brother Dubinsky himself lent a helping hand — breaking all precedents by addressing a campaign meeting of the Administration. His approval of the frame-up against Ames and his failure to investigate the conduct of the administration during the campaign showed the wider implications in the Local 10 elections.
‘ ‘ At the conclusion of this mock election, a flood of publicity was let loose with all sorts of exaggerated claims and falsehoods concerning the Bank and File vote.
“ The sanctimonious New York Times, which is heavily staffed with reactionary anti-Soviet, Social-Democratic stooges, printed, in addition to its story, a red-baiting editorial on the Local 10 elections. (The Times failed to inform its readers of what actually took place in this mock election, although its reporter received all facts in an hour-long interview with the chairman of the Bank and File.)
‘ ‘ The same members who allegedly supported Dubinsky’s, Antonini’s and Nagler’s policies in the I. L. G. W. U. gave them a sound trouncing in the A. L. P. primaries. (Not one red-baiting I. L. G. official was elected.)
“ The elections also show that in a free and democratic election, without fear of intimidation and job control, the results reflect the real sentiments of our progressive membership.
“ Above all else, our members demand democracy in our Union. For unless we have democracy, we shall continue to have these serious differences, and the kind of election we witnessed in Local 10.
“ Even at this eleventh hour it is not too late for President Dubinsky and the G. E. B. to discard their dangerous political policies of red-baiting and Soviet-sniping which leads to disunity, division in our ranks, and can only help our enemies at home and abroad.
‘1 Becent history has proved that anti-Communist crusades inevitably lead directly or indirectly, willingly or unwillingly, into the camp of Martin Dies, Bandolph Hearst, John L. Lewis, the pro-fascist anti-Semitic Polish government, and even Hitler.”
Article XIII of the constitution and by-laws of Local 10 relates to “ Offenses and Punishment ” and section 1 thereof provides: ££ Section 1. A member may be fined, suspended or expelled from the Union for any of the reasons stated in this Constitution and By-Laws and in Article 10 of the Constitution and By-Laws of the I. L. G. W. U. headed £ Offenses and Punishment \ All of said Article 10 of the Constitution and By-Laws *396 of the I. L. Gr. W. U. and all of the sections contained therein are to be deemed incorporated herein by reference and made a part hereof as if fully set forth herein. In addition, a member of the Union may be fined, suspended or expelled from the Union for acting contrary to this Constitution or jeopardizing the job of any of the members of the Union or for violating any of the shop regulations set forth under Article IX above, or for assaulting or slandering, libelling, or insulting officers or members of the Union in connection with any of their acts in their official capacities.”
Article X of the constitution and by-laws of the International relates to “ Offenses and Punishment ”, and section 5 thereof provides: ‘ ‘ Section 5. For any action or conduct detrimental to the interests of the I. L. Gr. W. U. or its subordinate bodies, and for slandering or libelling the I. L. Gr. W. U. or its subordinate bodies or any officers thereof, or distributing, directly or indirectly, any circular, leaflet or written or printed matter which contains defamatory, derogatory or scurrilous statements concerning the I. L. (1. W. U., its subordinate bodies or any officers thereof. ’ ’
The plaintiffs were given 20 days written notice to appear at a hearing of the executive board on June 15, 1944, to answer the charges made. A copy of these charges, identical in form and content with that of Exhibit “A ”, annexed to the plaintiffs’ complaint herein, was enclosed with this notice. They failed to appear. In accordance with the provisions of the constitution and by-laws, the hearing was adjourned and the plaintiffs were again summoned by registered mail to appear on June 22,1944, a copy of the charges being once more enclosed.
On June 21, 1944, the office of Local 10 received a letter signed by all of the plaintiffs demanding: (a) a bill of particulars of the charges preferred, (b) the right of each to be represented by a union member of his own choosing, (c) a public trial, (d) that a stenographer be present to report all the proceedings of the hearings, or, if this is not done, the privilege of furnishing such a stenographer.
Thereafter, on June 22, 1944, the plaintiffs appeared before the executive board where they refused to enter a plea until a decision was rendered on the matters contained in this letter. In accordance with the existing practices of Local 10 a plea of “ Not Guilty ” was entered for them by the chairman of the board. The board then considered the points raised by plaintiffs’ letter and decided: (1) that complainants proceed with their testimony and, if after that the accused felt that they *397 required particulars in writing or time to prepare their defenses, their rights would be fully protected; (2) that a stenographer would be present; (3) that because the charges were preferred against the plaintiffs jointly, they were entitled to one counsel of their own choosing, who must be a member of the union; and (4) the meetings of the executive board were not open to the public.
None of the defendants herein were members of the executive board. The defendants Nagler, Stulberg and Falikman, appeared at that hearing as the complainants since they were the ones who had preferred the charges; and defendant Shapiro was present in the course of his duties as president of Local 10. Only members of the executive board participated in the deliberations and the decision of that body.
Defendant Nagler was ordered by the chairman of the executive board to proceed with his testimony. When he had completed his testimony, the plaintiffs requested an adjournment and a bill of particulars. The hearing was thereupon adjourned to July 6, 1944, and the plaintiffs were provided with a copy of such particulars, comprising 19 pages.
On July 6,1944, the hearing was resumed. Each of the plaintiffs made statements in the nature of testimony and argument in his own behalf, but later plaintiff Ames, in cross-examining, acted as counsel for plaintiffs Davis, Nemerson and Seligman. There appears to have been a full hearing on both sides, including lengthy, prepared opening statements by plaintiffs, cross-examination by them of the complainants and their witnesses and summations by the plaintiffs.
After deliberation, the executive board found plaintiffs guilty as charged and rendered their decision as follows :
“Brother Arnold Ames be suspended for a period of five years from the date of this decision, from all rights, privileges and benefits of membership in Local 10 except the right to work in the industry and to receive a working card from Local 10; and that in the meantime, he comply with all the obligations of membership in Local 10.
“ Brothers Charles Nemeroff, Irving Kotler and Emanuel Brownstein be suspended for a period of three years from the date of this decision, from all rights, privileges and benefits of membership in Local 10, except the right to work in the industry, and to receive a working card from Local 10, and that in the meantime, they comply with all the obligations of membership in Local 10.
“ Brothers A1 Seligman, Abraham Davis and Louis Nemerson be suspended for a period of two years from the date of this *398 decision, from all rights, privileges and benefits of membership in Local 10, except the right to work in the industry and to receive a working card from Local 10, and that in the meantime, they comply with all the obligations of membership in Local 10. ’ ’
On August 28, 1944, this decision was reported and read in full to the membership of Local 10 at its meeting. Each of the seven plaintiffs spoke for at least 10 minutes, some longer and Ames upwards of 25 minutes; each spoke in his own defense and individually and collectively in opposition to the decision of the executive board. A rising vote was taken and there being 850 members present, 827 voted in favor and 23 voted against that decision. (One hundred members constitute a quorum under section 6 of article VIII of the constitution and by-laws of Local 10.) Plaintiff Ames testified that upwards of 2,500 members attended the meeting, of whom over 1,000 had left before the voting.
Thereafter, plaintiffs requested the appointment of a judiciary committee to reconsider this decision. This request came before a membership meeting on September 23, 1944, and a committee was duly appointed after the plaintiffs had exercised their constitutional privilege of invoking 10 challenges.
The hearing was held on October 3, 1944, and all the plaintiffs, except Louis Nemerson, appeared before the judiciary committee. Plaintiff Ames stated that he was acting on behalf of said Nemerson. The complainants at this hearing relied on the documentary proof submitted previously to the executive board, and the committee ruled in accordance with precedent that the appellants would be limited thereto and to such new evidence as they had acquired and wished to present.
The judiciary committee affirmed the decision of the executive board and reported that it be sustained. Although not required by the constitution and by-laws, this report was submitted to the membership meeting of Local 10 on November 27, 1944, and was approved by the membership.
Subsequently, on December 21, 1944, the plaintiffs appealed .to the appeals committee of the International, in accordance with the provisions of the constitution and by-laws. Due notice was given to each of the plaintiffs. Hearings were held lasting an entire day. Plaintiffs had the opportunity to freely examine and cross-examine the complainants. All the questions in the case appear to have been completely re-examined, and frilly considered. The complainants presented their evidence supporting the charges and they were cross-examined by the accused. The accused (plaintiffs here) produced seven members *399 as counsel and when the executive board sustained the original ruling that only one would be permitted, they remained as witnesses whose testimony when ruled material was taken. In accordance with precedent on appeals to the appeals committee of the International, the plaintiffs were accorded what amounted to a trial de novo. On or about October 23, 1945, the appeals committee, each of whom had been furnished with a transcript of the evidence, jointly deliberated and thereupon sustained the decision of the executive board and the judiciary committee, as approved by the membership of Local 10.
Consideration of the evidence requires the conclusion that each of the hearings described above was held on proper notice to the plaintiffs, with a full opportunity to be heard and to present documentary or other proof in defense; that each of the hearings was conducted fairly and impartially, before a regularly and legally constituted body selected in the manner provided in the constitution and by-laws of the International; that each of the mentioned tribunals gave due and careful consideration to the charges preferred, the evidence adduced, the exhibits before them, the demeanor of the witnesses and the arguments submitted by both sides; and that when the decisions were rendered, the plaintiffs were apprised thereof with reasonable promptness. As observed, each successive appellate tribunal, in turn, unanimously affirmed the decision of the executive board and of the preceding tribunal.
After the decision of the appeals committee of the International, the plaintiffs took no action for an entire year. On October 10,1946, the present action was commenced. No appeal has been filed with the International for consideration of this matter at its forthcoming convention, in May of this year, as required by section 19 of article 11 of the International’s constitution.
The issue of communism came into this case when, at the trial here, on cross-examination plaintiff Ames admitted he and a number of his associates in Local 10 were Communists and had been members of the Communist party. The issue is unimportant except that the statements and demands of plaintiffs appear to be explainable as Communist-motivated strategy, tactics and propaganda, to sow, as Lenin put it, “ among the masses hate, repulsion, and scorn toward those of different thought ”, and for the same purpose to demand unlimited freedom of speech and press, and the guarantees of due process under the charters of democracy in America and all places where Communists are not in power, which in the countries of the *400 Soviets are denied, suppressed, controlled or limited to function solely for the State. In other words, they demand for themselves what they would deny if they were in power. Since the beginning of the Mosaic dispensation down through the Christian era, the basic concept of man in respect to himself and his relations to others, including community, state or country, was that, as a creature of God, the Supreme Being, he was required to know, love and serve Him and to fulfill His law, and, as a child of God, to love and treat his fellowmen as children of the same Eternal Father. In living under this concept men have banded in religious, cultural, ethical, political and economic organizations and through customs springing from the divine law and natural law which arose therefrom, and morality and conscience guided thereby, and expressed in laws adopted under such sanction, they have regulated their acts and conduct for their mutual protection, security and advancement. Imperfect these human laws and relations have been. Obviously, this was due to the imperfections of human beings. The closer human laws have approximated the divine law and its requirements of morality, charity, justice and truth, the nearer they approached perfection. In similar ratio, as human laws digressed from or violated the eternal verity of the divine law, they became capricious, contrary to reason and common good, oppressive and tyrannical. Soviet communism denies both the Old Jewish Testament and the New Christian Testament, the existence of Jehovah — God — the Supreme Being, and asserts man is an animal without a soul — an amoral, soulless, collective animal.
Karl Marx stated: ‘ ‘ The democratic concept of man is false. The democratic concept holds that each man has a value as a sovereign being. This is the illusion, dream and postulate of Christianity, namely that man has a sovereign soul. # * * If we speak of individuals it is only in so far as they are personifications of economic categories and representatives of special class relations and interests. ’ ’
Lenin stated: ‘ ‘ Religion is the opium of the people. And this postulate is the cornerstone of the whole philosophy of Marxism.
“Atheism is an integral part of Marxism. Consequently, a class-conscious communist party must carry on propaganda in favor of atheism. The conscious and deliberate planning of all the social and economic activities of the masses will cause religious prejudices to die out. The Communist party organizes *401 the widest possible scientific, educational and anti-religious propaganda.
“ Our program is based entirely on a scientific, to be more precise, upon a materialist, world conception. Our program necessarily includes the propaganda of atheism. We demand that religion be regarded as a private matter as far as the state is concerned, but under no circumstances can we consider it a private matter with regard to the Communist party. [Our party] does not for a minute regard the fight against religion as a private matter.
“ We deny all morality taken from super-human conceptions. We say that our morality is wholly subordinated to the interests of the class struggle. We deduce our morality from the facts and needs of the class struggle. We say that a morality taken from outside of human society does not exist for us; it is a fraud.
“We must be ready lor trickery, deceit, lawbreaking, withholding and concealing truth.”
Stalin has stated:
“ Words must have no relation to action; otherwise what kind of diplomacy is it? Words are one thing, actions another. Good words are a mask for bad deeds. Sincere diplomacy is no more possible than dry water or wooden iron.
‘ ‘ The scientific concept, dictatorship of the proletariat means nothing more nor less than power which directly rests on violence, which is not limited by any laws or restricted by any absolute rules. Dictatorship means — and note this for once and for all — unlimited power, resting on violence, and not on law.
“ It is inconceivable that the Soviet republic should continue to exist for a long period side by side with imperialist states; ultimately one or the other must conquer.
“American democracy and the Soviet system cannot evolve into each other. The Soviet system will not evolve into American democracy or vice-versa.”
Earl Browder stated: “ In going among the religious masses we are for the first time able to bring our anti-religious ideas to them.”
In the Communist manifesto it is said: ‘ ‘ Abolition of the family! Even the most radical flare up at this proposal of the communists! But on what foundation is the family based? On capital, on private gain. The bourgeois family will vanish as a matter of course when its complement (religion) vanishes, and both will vanish with the vanishing of capital.”
*402 William Z. Foster in his book *1 Towards a Soviet America ’ ’[1] writes: ‘ ‘ Stalin is one of those who think that an economic crisis after this war is inevitable in the IT. S. Conditions are more ripe for revolution in the U. S. than they were in old Russia. The American revolution, when the workers have finally seized power, will develop even more swiftly. The American government will be organized along the broad lines of the Russian Soviets.”
In the Theses and Statutes of The Communist International, Second World Congress, Moscow, July to August, 1920,[2] it is stated: ‘ ‘ Every party desirous of belonging to the Communist International should be bound to carry on systematic and persistent Communist work in the labor unions, cooperatives and other organizations of working masses. It is necessary to form Communist nuclei within these organizations, which by persistent and lasting work should win over labor unions to Communism. These nuclei should constantly denounce the treachery of the social patriots and of the fluctuations of the ‘ centre. ’ These Communist nuclei should be completely subordinated to the party in general.”
In The Programme of the Communist International adopted by the Sixth World Congress, September 1, 1928,[3] at Moscow, in the section devoted to “ The Strategy and Tactics of the Communist International in the Struggle for the Dictatorship of the Proletariat ” it is stated that in the fight against capi-
*403 talism there are encountered frequent tendencies among the working class which render it incapable of adopting sustained and scientifically planned strategy and tactics or of carrying on the struggle in an organized manner on the basis of the stern discipline of the proletariat. These, it is stated, are expressed in various forms, among them in trade unions which frequently are connected or affiliated with church organizations such as Jewish, Protestant or Catholic, by leaders sanctifying the abomination of capitalism with the approval of religion, and by terrorizing the members with the spectre of punishment of the world to come. It is also stated these tendencies are fostered by reformism, which in America accepts the gospel from the “ tablets of * * * politics ”, the model of which is the “ anti-socialist and openly counter-revolutionary American Federation of Labor ”, and in Great Britain is “ His Majesty’s Socialists of the British Labor Party.” The program also states: “ Standing out against all these tendencies is Proletarian Communism. * * * it conducts a theoretical and practical revolutionary struggle for the Dictatorship of the Proletariat, and in the struggle applies all forms of proletarian mass action.
“ When the revolutionary tide is not rising, the Communist Parties must advance partial slogans and demands that correspond to the every day needs of the toilers, and combine them with the fundamental tasks of the Communist International. The Communist Parties must not, however, at such a. time, advance transitional slogans that are applicable only to revolutionary situations (for example workers’ control of industry, etc.). To advance such slogans when there is no revolutionary situations means to transform them into slogans that favor merging with the capitalist system or organization.
‘1 When a revolutionary situation is developing, the Party advances certain transitional slogans and partial demands corresponding to the concrete situation; but these demands and slogans must be bent to the revolutionary aim of capturing power and of overthrowing bourgeois capitalist society. The Party must neither stand aloof from the daily needs and struggles of the working class nor confine its activities exclusively to them. The task of the Party is to utilize these minor every-day needs as a starting point from which to lead the working class to the revolutionary struggle for power.
1 ‘ When the revolutionary tide is rising, when the ruling classes are disorganized, the masses are in a state of revolutionary ferment, the intermediary strata are inclining towards the proletariat and the masses are ready for action and for *404 sacrifice, the Party of the proletariat is confronted with the task of leading the masses to a direct attack upon the bourgeois State. This it does hy carrying on propaganda in favor of increasingly radical transitional slogans (for Soviets, workers’ control of industry, for peasant committees for the seizure of the big landed properties, for disarming the bourgeoisie and arming the proletariat, etc.) and hy organizing mass action, upon which all branches of Party agitation and propaganda, including parliamentary activity, must be concentrated. This mass action includes: a combination of strikes and demonstrations-; a combination of strikes and armed demonstrations; and finally, the general strike conjointly with armed insurrection against the State power of the bourgeoisie. The latter form of struggle, which is the supreme form, must be conducted according to the rules of war; it presupposes a plan of campaign, offensive fighting operations and unbounded devotion and heroism on the part of the proletariat. An absolutely essential condition precedent for this form of action is the organization of the broad masses into militant units, which, by their very form, embrace and set into action the largest possible numbers of toilers (Councils of Workers’ Deputies, Soldiers’ Councils, etc.), and intensified revolutionary work in the army and the navy.
‘ ‘ In passing over to new and more radical slogans, the Parties must be guided hy the fundamental role of the political tactics of Leninism, which call for ability to lead the masses to revolutionary positions in such a manner that the masses may, by their own experience, convince themselves of the correctness of the Party line. Failure to observe this rule must inevitably lead to isolation from the masses, to putschism, to the ideological degeneration of Communism into ‘ Leftist ’ dogmatism and to petty-bourgeois ‘ revolutionary ’ adventurism. Failure to take advantage of the culminating point in the development of the revolutionary situation, when the Party of the proletariat is called upon to conduct a hold and determined attack upon the enemy, is not less dangerous. To allow that opportunity to slip by and to fail to start rebellion at that point, means to allow the initiative to pass to the enemy and to doom the revolution to defeat.”
Truth is the object of the intellect. It has been sought ceaselessly hy man in freely exercising his faculty of thinking since the beginning of time. As men have come to the knowledge of truth, they have ardently grasped and accepted it, and with eager honesty have communicated such knowledge to their •fellowmen. This is not so with communism or Communists. *405 Their concept not only denies the freedom and ability of the individual to think, act and decide for himself, but demeans him into a soulless animal merely representative of a material class category. Each individual under their doctrine is subjected to the domination and directive of a so-called proletarian dictatorial hierarchy which, stratum by stratum, is subordinated to the absolute control of the group higher up until the tyrannical will of the uncontrolled powerful dictator is imposed on all.[4] With Communists no one has the ability to think or act except in conformity with his superiors, unless he has sufficient personal power to do so directly or by sufferance of the all-powerful dictator. The Communists’ purpose is not to ascertain and make known the truth. As expressed in their official statements, it is to dupe and deceive others into entering upon false positions of seeming security induced by deceitful propaganda, misinformation and misunderstanding until, entrapped, they are unable to extricate themselves from the dictatorial power imposed upon them from above, to which they have become enslaved. Diametrically opposite is democracy, and particularly American democracy, whose fundamental concept is God and the rights each and every man has at birth as his endowment from God. The clearest statement of the Communist concept is given by Stalin. He stated: “Dictatorship (of the proletariat) means — and note this for once and for all — unlimited power, resting on violence, and not on law.”
The clearest and most concise statement of fundamental American democracy is contained in the Declaration of Independence: “We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Eights, that among these are Life, Liberty and the pursuit of Happiness. That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed ’ ’.
The two concepts, American democracy and Soviet communism, are indeed in fundamental conflict.
Admittedly it is most difficult to find a common basis for tolerance and agreement between persons in constant close proximity with such diametrically opposed fundamental concepts.
Perhaps the present solution for the situation, world wide or at home, now that all nations and all men are neighbors and isolation seems practically impossible, is for us to live and do business with the Communists, without illusions and with con-
*406 stant vigilant watchfulness, always ready and alerted to counter every strategy, tactic and propaganda with realistic measures. Communists are bound on pain of liquidation or party expulsion and ostracism to accept the basic materialistic concepts and obligations of Soviet communism. Their ideology and acts impel us to a vigilant and prepared posture of alerted defense of our own ideology and the principles and ideals of our American democracy and way of life.
What the ultimate solution may be is most difficult to forecast. Part or complete outlawing of party and person acting subversively or openly to carry on expressed conspiracy and threats not only to violate or nullify common and statutory laws, but also to overthrow or destroy the basic fundamental laws expressed in Federal and State Constitutions, has been suggested. The international crisis, of which the domestic problem is a part, intensifies the necessity of immediate defense against, or gradual abject surrender to, world Soviet communism. These problems have and must, until the solution is found, continue to have the most earnest and urgent consideration of the best minds of the nation and particularly of the legislative and executive branches of the government. No more critical question charged with such portentous significance has ever been presented to this and the other democratic nations of the world. Solution there must and will be, but it will not be found in symbolic phrases embodying that of “ the brotherhood of man ” unless all men who have faith and hope therein sincerely rededicate themselves to the necessary corollary of “ the Fatherhood of God ” and the implicit obligations of morality of the divine law.
The length of what has just been said adds no importance here to the issue of communism which, as observed, is of minor importance in this litigation. But it must be observed that the statements of the accused (plaintiffs here) are quite an exhibition of communistic double talk. On the one hand are seen irresponsible defamatory statements attacking leaders of high standing among union workers and their fellow-American citizens as well, couched in provocative phrases over-loaded with adjectives of insinuation and invective calculated through deceit to ruin their reputations with their fellow unionists. On the other hand, acts praiseworthy as American citizens are held up for scorn and ridicule as being anti-Soviet, and associations of interest and value to union workers are seized upon to suggest, and thereby to stir up, race prejudice which, were such statements not obviously sanely schemed, are so ridiculous, as to require the finding of being the emanations of an unbalanced *407 mind. The use of other phrases, such as ‘ ‘ Bank and File Committee or Members ”, also have the double purpose of possessing identifying significance to fellow Communists or less courageous fellow travellers, and of attempting to delude the many union non-Communist members who are properly in the category of rank and file into class sympathy and consequent resentment against present leaders.
The real issue here, however, is not communism. It is whether the accused were deprived of due process, had a fair and impartial trial, and fair and impartial hearings on their various appeals before the respective union tribunals; whether the statements were not defamatory but true, and, in any event, fair comment and privileged; whether the members or officers of the Union tribunals were biased, prejudiced and disqualified, or under the domination and control of the defendant Union officials; and whether the decision was unwarranted by reason of insufficient supporting evidence. Begardless of association or suggested motive, plaintiffs were entitled to all the rights and privileges guaranteed to all alike under the laws and Constitutions of New York State and of the United States. They should have received no less upon the trial and hearings before the Union, and, as will be demonstrated, they did receive every right and benefit to which they were entitled. They are entitled to and will be accorded the full benefits of law and Constitutions before this court.
The law in relation to the issues between the parties to this action is well settled. The constitution and by-laws of unincorporated associations, as are Local 10 and the International, express the rights, privileges and obligations of the members of such an association and, unless in contravention of the public law, they are conclusive upon and enure to the benefit of both members and the Union. (Polin v. Kaplan, 257 N. Y. 277, 281.)
In Matter of Pratt v. Rudisule (249 App. Div. 305, 306) it was held: “ The petitioner’s membership in the local union is a status burdened with conditions. It does not import rights and privileges alone; there are inherent obligations. Whatever rights and privileges are accorded him by the union are derived from its constitution which also defines procedure by which his membership may be terminated. His acceptance of benefits which his membership affords gives rise to an implied agreement on his part to abide by the constitution and by-laws of the organization.”
Where it appears that disciplinary proceedings against a member of an unincorporated association, for a violation of its constitution and by-laws, are conducted regularly in accordance *408 therewith, upon proper notice to the accused and with an opportunity to be heard and with a proper regard for his rights, a court of equity will not substitute its judgment for that of the association. In Polin v. Kaplan (supra, pp. 281-282) it was held: “As the contract may prescribe the precise terms upon which a membership may be gained, so may it conclusively define the conditions which will entail its loss. Thus, if the contract reasonably provides that the performance of certain acts will constitute a sufficient cause for the expulsion of a member, and that charges of their performance, with notice to the member, shall be tried before a tribunal set up by the association, the provision is exclusive, and the judgment of the tribunal, rendered after a fair trial, that the member has committed the offenses charged and must be expelled, will not be reviewed by the regularly constituted courts. (Belton v. Hatch, 109 N. Y. 593; Matter of Haebler v. N. Y. Produce Exchange, 149 N. Y. 414.) A court ‘ cannot review the proceedings or re-examine the merit of the expulsion. ’ (Per Miller, J., in Wilcox v. Royal Arcanum, 210 N. Y. 370, 376.) ”
The subject matter of the charges is not in contravention of the public law. Indeed, if sustained by evidence on trial and not overcome by the defenses of truth, fair comment and privilege, much of the subject matter would be libelous under common law and statutes, both civilly and criminally.
In Pratt v. Rudisule (supra, p. 307) it was further held as follows: “ If the trial of these charges, following proper notice to the petitioner, was had before the trial board and an appeal was heard by the appellate body created for that purpose by the constitution of the union, and such proceedings were conducted regularly, with proper regard for petitioner’s legal rights, the determination thus made cannot be reviewed upon the merits by a legally constituted court. (Polin v. Kaplan, supra, p. 282; Wilcox v. Royal Arcanum, 210 N. Y. 370, 376; People ex rel. Johnson v. N. Y. Produce Exchange, 149 id. 401, 409, 410; Young v. Eames, 78 App. Div. 229, 241; affd., 181 N. Y. 542; Havens v. King, 221 App. Div. 475, 480; affd., 250 N. Y. 617; People ex rel. Holmstrom v. I. D. B. B. Union, 164 App. Div. 267, 270; Rubens v. Weber, 237 id. 15,19.) ” (See, also, Riddoch v. Sullivan, 43 N. Y. S. 2d 595, 598; Harmon.v. Matthews, 27 N. Y. S. 2d 656; Frause v. Sander, 66 Misc. 601; Chafee, Internal Affairs of Associations Not for Profit [1930] (43 Harv. L. Rev. 993.)
In Harmon v. Matthews (supra, p. 659) it was stated:
1‘ Undoubtedly, unless some other legal method is provided by its law, before a member can be expelled upon charges from *409 a trade union or any voluntary unincorporated association, he is entitled to have the charges made known to him. In addition, either before the association or a body selected by the members for a trial or hearing, at a time and place of which he is given reasonable notice, he is entitled to be confronted by his accusers and. the witnesses against him, with reasonable opportunity to question or cross-examine them, examine the evidence, and to answer, explain, defend and present evidence and the testimony of witnesses in his own behalf. Those rudimentary rights must be observed which arc essential to any fair trial. That does not mean that the procedure known to the common law or defined by statute or rule for the conduct of the public courts or judicial or quasi-judicial bodies, must be followed. It means that the charges must be presented and the trial or hearing conducted and the decision or determination executed in accordance with the constitution, by-laws and rules of the association.”
Courts will not weigh the evidence before a Union tribunal which was the basis of the decision there, or substitute the court’s judgment for that of the Union tribunal. This rule is particularly salutary where the charges have been sustained after full hearing by the membership and the appeals tribunals of the association.
The Court of Appeals in People ex rel. Johnson v. New York Produce Exch. (supra, p. 414) held: “ The question for the court is not whether, passing upon the evidence as res nova, it would have reached the same conclusion as that of the board of managers, or whether the conclusion was reasonable or unreasonable, but simply and wholly whether the case was so bare of evidence to sustain the decision that no honest mind could reach the conclusion [of the board of managers] that the relator’s conduct was [as charged] ‘ inconsistent with just and equitable principles of trade.’ (See Dawkins v. Antrobus, L. R. [17 Ch. Div.] 615.) ” (See, also, Avery v. Moffatt, 187 Misc. 576, 583; Fritz v. Knaub, 57 Misc. 405, affd. 124 App. Div. 915; Young v. Eames, 78 App. Div. 229.)
It must be held that the accused (plaintiffs here) were not deprived of due process or a fair and impartial hearing. The written notice of charges and the bill of particulars served clearly and completely set forth the accusations made against the accused and informed them of the provisions of the constitution and by-laws of Local 10 and of the International allegedly violated. The procedure followed upon the hearings before the various tribunals was in accordance with the constitution and by-laws of the Union. Plaintiffs’ allegations of conspiracy and that the members of the various tribunals were *410 under the domination and control and acted under instructions from and directions by defendants Dubinsky and Nagler are not only not proved, but are unsupported by any evidence of probative value on the trial before this court. Similar assertions made before the various tribunals are shown upon this trial by the records of the Unions and such tribunals to have been unsupported there by any probative evidence. Plaintiffs’ allegations that an appeal to the convention in May, 1947, of the International would be futile because the delegates would be under similar control and direction is not supported by any proof upon the trial here. The fact that the charges were preferred by officers of Local 10 and that they presented same before the executive board of Local 10 and gave testimony in respect thereto before the Union tribunals does not render the trials and appeals illegal. As pointed out above, the accused not only should be but are entitled to be confronted by their accusers and the witnesses against them, with reasonable opportunity to question or cross-examine such accusers. The fact that a member of the executive board of Local 10 stated he saw several of the accused distribute the leaflets as charged, if tending to show any disqualification, did not disqualify any other member and was harmless in view of the fact that the accused themselves admitted distribution and stated they assumed full responsibility for printing, publication and distribution.
In Avery v. Maffatt (187 Misc. 576, 585, supra) is is stated: “ It has been held that when the rules of a voluntary association are followed the courts will not interfere with disciplinary action taken against a member solely because the charges are preferred by a member of the governing board which is to try the case (Nat. League of Commission Merchants v. Hornung, 148 App. Div. 355; Green v. Board of Trade, 174 Ill. 585; Wood v. Chamber of Commerce, 119 Wis. 367). ”
The evidence before the executive board of Local 10 warranted its conclusion that the statements which the accused (plaintiffs here) admitted they printed, published and distributed were not true. Although, in the first instance, the complainant is not usually required to prove the falsity of a defamatory statement, the complainant officers of Local 10 testified the statements were false. The accused, who claimed the statements were true, fair comment and privileged, were then under the obligation to support those defenses by evidence. Current reports and suspicions, of which there was some testimony, are not proof of truth, fair comment or privilege. The record of the trial and decision of guilty, previously rendered against Ames on the prior charge before the executive board of Local 10, which *411 after full hearing on appeal, in accordance with the constitutions of the Local and International, was sustained before every tribunal of appeal, including the International, conclusively established his guilt of the charges then made. The subsequent statement that in the presentation of, hearings on, and determination in respect to such charges he was ‘ ‘ framed ’ ’ by the named officials of the Local and International, was defamatory. As the charges under consideration here came within the provisions of the constitution and by-laws both of Local 10 and the International, they and the prosecution of them before the various tribunals of the Union would be comparable to a prosecution for similar offenses, criminal in nature, before the public courts. The author and distributor, as well as one repeating or giving currency to the defamatory matter originated by another, would be chargeable with liability. The charge, as in an indictment, should be sufficiently clear and complete to show the offense charged and to bring the statements within the provisions of the Union laws allegedly violated. Where several persons are charged with having uttered defamatory words in concert, the proceedings could legally be against them jointly. Since the members of the Union are lay persons, they are not required to act with the same precision, conciseness and clarity in fully stating the essential facts expected of public authorities. Several publications, which it is claimed constitute the offense or offenses charged, may be joined together, and technical defenses maintainable in the public courts are not applicable to Union charges. The real test of the sufficiency of such a Union charge is whether it fully informs the accused of the facts constituting the alleged offense and the provisions of the constitution and by-laws allegedly violated. Here the original charges did that in substance and the written bill of particulars, furnished to the accused before the trial, set forth the printed, published and distributed statements which the complainants asserted were defamatory and libelous of the Union’s officers and acts and conduct detrimental to the interests of the International and Local 10. As pointed out, the statement of ‘ ‘ frame-up ’ ’ was defamatory. The further statements that 1 ‘ Manager Nagler and his assistants plotted the frame-up. * * * This conspiracy was hatched by Nagler, Stolberg and Falikman ” (other officers); that “ this shake-down will net the Nagler-Stolberg administration more than $15,000 ”; and that “ Nagler, Stolberg and Falikman framed Arnold Ames on trumped-up charges, and made a similar job on three other Bank and Filers”; “Shake-down protested to President Dubinsky ”; “Bank and File says Nagler-Stolberg plot ‘ Ja ’ election in *412 Local 10,1. L. Gr. W. U.”; were likewise defamatory and violated the mentioned provision of the Unions’ constitutions and bylaws. The repetitions of such statements in contexts charging the same officers with “ dangerous policies of persecution, red-baiting, Soviet sniping ” and “ President Dubinsky and the G-. E. B., including Nagler, support the reactionary A. F. of L. top leaders, in their refusal to sit together with the heroes of Stalingrad ’ ’, and consorting with alleged anti-Semites, were calculated to bring the President and officers of the International and the named officers of Local 10 into disrepute, contempt and ridicule and to stir up racial and class prejudice or hatred among the membership, all to the detriment of the interests of the International and Local 10. These acts constituted violations of section 1 of article XIII of the constitution and by-laws of Local 10, and section 5 of article X of the constitution and by-laws of the International.
Here the persons defamed are shown to be men of excellent reputations, but even were a defamed person shown to have a bad character that would not be justification or defense against defamation which in fact was untrue. Indeed, as a general rule where truth is pleaded in justification, a failure to sustain the plea by proof has been considered as aggravation unless shown to have been interposed in good faith with reasonable grounds for the belief pleaded. Language imputing lack of integrity, qualification or dereliction. of duty to an official is defamatory unless shown to be true or fair comment. In respect of the latter, it may be observed that when a person offers himself as a candidate for office or reelection his character for honesty and integrity and his qualifications and fitness for the office are presented as subjects for fair comment by contrast, comparison or analysis.
There is undoubtedly difference of opinion among judicial authorities as to privilege in the utterance of false statements published in good faith and without malice. (Briggs v. Garrett, 111 Pa. 404, 417; Express Print Co. v. Copeland, 64 Tex. 354, 358; Bronson v. Bruce, 59 Mich. 467, 474; Pattangall v. Mooers, 113 Me. 412, 416; Starks v. Comer, 190 Ala. 245, 248; Post Pub. Co. v. Hallam, 59 F. 530, 540 [C. G. A. 6th]; Putnam v. Browne, 162 Wis. 524; Estelle v. Daily News Pub. Co., 99 Neb. 397, 401; Wason v. Walter [1868-1869], L. R. 4 Q. B. 73, 93.) False statements against one seeking an appointive office have been held to be not privileged. (Hunt v. Bennett, 19 N. Y. 173.)
The law of fair comment and privilege in libel has been gradually developed and is of comparatively modern origin. Therefore, the factual questions of truth and fair comment in *413 good faith without malice and with reasonable cause and privilege must be regarded as being within the exclusive province of the tribunal whose jurisdiction is properly invoked. In the case here such tribunals are those of Local 10 and the International. The findings of fact, constructions applied and result reached in these Union tribunals may not be held to be in violation of the statutory or constitutional rights of the accused (plaintiffs here) or, indeed, in contravention of accepted rudimentary principles of trial procedure and decision. They are, accordingly, exclusive of and free from review by or substitution therefor of the judgment of any public court.
What has been said above in respect of the points discussed is equally applicable to all raised and, more particularly, the ruling in respect of representation by counsel. In the public courts the right to be represented by individual counsel of one’s own selection is governed by statutory or constitutional provision. The right, although most valuable, is not a natural one but a creature of positive law. That is the effect also of the provision in the Union’s constitution and by-laws in respect of representation at the trial or hearing by a fellow union member. In this connection it is observed that the charges were made against the accused jointly and the trial and hearings were jointly prosecuted and defended.
The record here, consisting, in the main, of the records and testimony concerning the proceedings there, indicates the accused well and fully stated their own positions, and it is not shown here that any material evidence or witness produced and offered there was excluded or suppressed. While allowance of a separate representative for each accused would have been more in consonance with the public law and the practice of the public courts, the questions of discretion, the right of construction of the provisions of the Union’s constitution and by-laws, and of establishing rules in respect of practice and procedure are exclusively within the province of the Union and its tribunals.
Upon the grounds and for the reasons expressed, the conclusion follows that plaintiffs are not entitled to the relief sought by them and, on the contrary, defendants are entitled to judgment dismissing the plaintiffs’ complaint upon the merits, with costs.
As all the facts deemed essential herein are found and stated above, this opinion constitutes the decision of the court. Submit judgment on notice.

. Coward-McCann Inc., N. Y. Out of print. Quotations above in respect to Soviet Communism or from Marx, Lenin, Stalin, Browder, and Foster are from “ Blueprint for World Conquest with Introduction by William Henry Chamberlin ”; Human Events, Washington-Chicago, 1946, or from “ Doctrine of Communism ”; Clare Booth Luce, Tablet, Brooklyn, N. Y. November 10, 1946, and are subject to verification with original sources. See also the following: “I Chose Freedom ”, Victor Kravchenko, Charles Scribner’s Sons, N. Y.; “ This Is My Story ”, Louis Budenz, McGraw-Hill, N. Y.; “ The Struggle For The World”, James Burnham, John Day Co., N. Y.; “Behind the Iron Curtain ”, George Moorad, Fireside Press, Inc., N. Y.; “Soviet Impact On Western World”, Edward Hallett Carr, MacMillan Co., N. Y.; “East of The Iron Curtain ”, William Von Narvig, Ziff-Davis Publishing Co., N. Y.; “ Real Soviet Russia ”, David D allin, Yale Press; “Russia, Menace or Promise ”, Vera M. Dean, Henry Holt & Co., N. Y.; “War or Peace with Russia ”, Earl Browder, A. A. Wyn, N. Y.; and “Problems of Leninism ”, Joseph V. Stalin, International Publishers Co., N. Y.

- The Theses and Statutes of the Communist International [as adopted at the Second World Congress, July 17 to August 7, 1920 at Moscow, Russia] (New York, Central Executive Committee of the Communist party of America, 1921).

. « The Programme of the Communist International ”, Adopted by the Sixth World Congress on September 1, 1928 in Moscow, International Press Correspondence (Vienna), Volume VIII, Number 92, December 81, 1928.

. “ Constitution and Rules of the Communist International ”, International Press Correspondence, Volume VIII, Number 84, November 28, 1928.